S. Kriete OSBORN, Appellant,

v.

SINCLAIR REFINING COMPANY, Appellee.

No. 8798.

United States Court of Appeals Fourth Circuit.

Argued Jan. 17, 1963.

Decided Nov. 4, 1963.

568

John S. McDaniel, Jr., Baltimore, Md. (Cable & McDaniel, and Calhoun Bond, Baltimore, Md., on brief) for appellant.

Milton Handler, New York City (David R. Owen, Baltimore, Md., Stanley D. Robinson, Melvin A. Eisenberg, and Kaye, Scholer, Fierman, Hays & Handler, New York City, on brief) for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BRYAN, Circuit Judges.

SOBELOFF, Chief Judge.

This case is here for the second time. On the former appeal [1] we held that, as a result of coercion by the Appellee Sinclair Refining Company, there existed between it and its gasoline dealers in the State of Maryland, one of whom was the Appellant Osborn, tying arrangements amounting to a per se violation of section 1 of the Sherman Act, 15 U.S.C.A. § 1. More specifically, we held that Sinclair required its gasoline dealers, as a condition for leasing service stations and purchasing gasoline from Sinclair, also to buy substantial quantities of Goodyear tires, batteries, and accessories (TBA), thus closing off a significant market to suppliers of competing brands of TBA. [2]

1. Osborn v. Sinclair Refining Co., 4 Cir., 286 F.2d 832, cert. denied, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961).

2. Sinclair had entered into an agreement with the Goodyear Tire and Rubber Company whereby Sinclair agreed to assist actively in selling Goodyear TBA to Sinclair dealers, and in return Sinclair was to receive a commission on all TBA sold to its dealers.

It was further held that, under the principles of Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed. 2d 545 (1958), Sinclair had sufficient economic power in Maryland with respect to service stations and gasoline appreciably to restrain competition in TBA, and that a not insubstantial amount of commerce was affected.

Our holding that trade-restraining arrangements existed whereby Sinclair tied the sale of TBA to the lease of service stations and the sale of gasoline, rested upon the District Court's unchallenged findings of basic facts regarding Sinclair's conduct toward its dealers generally and toward Osborn particularly. For example, it was found that Sinclair maintained a policy against its dealers carrying sizeable stocks of TBA other than Goodyear; that when Sinclair took on new dealers, it would secure initial orders of Goodyear TBA simultaneously with the execution of leases and dealer sales agreements; that Sinclair impressed upon its sales personnel the desirability of dealers carrying 100% Goodyear TBA; that at annual sales meetings dealers were warned by Sinclair that it was dissatisfied with the dealers' Goodyear TBA sales; that at one annual sales meeting Sinclair explicitly warned its dealers in Maryland that unless they purchased more Goodyear TBA, they could expect leases to be terminated; and that Sinclair kept records of Goodyear TBA purchases by its dealers and considered these purchases in determining at the end of each year whether to renew or terminate a dealership.

Turning to the history of Osborn's operations in particular, from 1936 to 1948 he had a service station in Maryland under a lease, and a dealer sales agreement, from Sinclair. The District Court found that in 1948, Osborn's lease was cancelled partly because he was not handling enough Goodyear TBA. After the cancellation, however, when he agreed at a conference with Sinclair officials to place a sizeable order for Goodyear TBA, Sinclair decided to give him another chance and signed a new lease and dealer sales agreement with him. Both the lease and the dealer sales agreement were for one year, ending May 31, 1949, and thereafter for successive terms of one year each, until terminated by either party upon 30 days' written notice prior to the end of any such term. On May 31, 1956, after giving Osborn notice, Sinclair cancelled the agreements, terminating both the lease of the service station and the dealer sales agreement under which Osborn had been purchasing gasoline. The District Court found that Osborn's failure to purchase sufficient quantities of Goodyear TBA contributed to Sinclair's decision to cancel the agreements. This cancellation precipitated the present action by Osborn against Sinclair for treble damages under section 4 of the Clayton Act, 15 U.S.C.A. § 15.

▇▇ Sinclair's principal defense in the former appeal was that its above-described conduct merely amounted to a unilateral refusal to deal, lawful under the principle that a seller may choose his customers as he sees fit. Cf., United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). However, as was pointed out in our earlier opinion, a seller's right not to deal with a particular buyer has been limited; for if the seller, in order to secure adherence to policies of price maintenance, tying arrangements, or similar suppressions of competition, uses means that go beyond a simple announcement of policy and declination to sell, his conduct falls under the proscriptions of the antitrust laws.[3] We have heretofore held in this case that Sinclair's conduct went beyond a mere announcement of policy and re-

3. United States v. Schrader's Son, Inc., 252 U.S. 85, 99–100, 40 S.Ct. 251, 64 L.Ed. 471 (1920); Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 452–453, 42 S.Ct. 150, 66 L.Ed. 307 (1922); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 625, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); United States v. Parke, Davis & Co., 362 U.S. 29, 43–44, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

fusal to deal, and that the discontinuance in 1956 of business relations with Osborn found no justification in any teaching of the Colgate case.

Having held that there was an unlawful arrangement between Sinclair and its dealers, and that Osborn's refusal to abide by it contributed to the cancellation of his lease and dealer sales agreement, we remanded solely for a determination of Osborn's recoverable damages.[4] Noting that there were questions inherent in this phase of the case—such as whether Osborn was required to pay more for Goodyear TBA than he would have paid for other brands which he desired, and whether Sinclair's contractual right to terminate the lease and dealer sales agreement had any bearing on the recovery of damages flowing from the cancellations—we explicitly refrained from intimating any opinion on the measure of damages.

Upon remand, the District Court found that before the cancellations Osborn had suffered, as a result of the tying arrangement, certain damages amounting to only $325, which trebled amounts to $975.[5] This was due to the slightly higher cost of the Goodyear TBA, which Osborn purchased, over other brands he would have preferred. With respect to damages sustained in consequence of the cancellations, the District Court found that Sinclair would have terminated these contracts a year later for reasons not related to the unlawful tie-in, and that therefore a loss of profits for only one year was attributable to the termination. The court found that these additional damages, if allowable, would amount to $12,000, which trebled would be $36,000. The court was of the opinion, however, that as a matter of law the damages flowing from Sinclair's refusal to continue to do business were not recoverable. It accordingly declined to award Osborn the $36,000 treble damages flowing from the refusal to deal, and gave judgment for the limited sum of $975, plus $14,000 attorneys' fees.

On the present appeal, neither Sinclair nor Osborn contests the $975 award for damages sustained before May 31, 1956. when Sinclair put an end to the lease and the dealer sales agreements. Nor is the $14,000 award for attorneys' fees challenged. Osborn, however, assigns as error the court's failure to award damages occasioned him by the refusal to deal. He also complains that the court erred in fixing the latter category of damages at only $12,000, in the event that this item is held to be recoverable.

The District Court's ruling that Osborn may not recover for the injury caused by the termination of his lease and dealer sales agreement, and Sinclair's argument in defense of that ruling, are grounded upon the so-called "single trader rule" of United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), i. e., that a seller has the right to deal with whomever he desires, and thus may announce a policy of price maintenance, exclusive dealing, etc., and may refuse to sell a customer failing to adhere to such policy. In spite of our decision on the first appeal that Sinclair's conduct went beyond a mere announcement of policy and a permissible refusal to deal, and therefore was not within the limited dispensation of the Colgate case, when the District Court came to assess damages, it declared that a refusal to deal was not a per se restraint of trade in violation of the Sherman Act unless done in concert with others as part of a conspiracy (as in Klor's Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)) or unless the unwillingness to deal was in furtherance of a monopoly.[6] In the absence of conspiracy or monopoly, the Court held that

4. The District Court had initially held that Osborn failed to establish a violation of the antitrust laws, and thus the court did not go into the matter of damages at the first trial.

5. The District Court's opinion is reported at 207 F.Supp. 856.

6. See, e. g., Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 375, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

no action could be maintained unless the refusal to deal offended the "rule of reason," i. e., that it constituted an "unreasonable" restraint of trade in light of *all* the circumstances of the case. The District Court recognized, in accordance with our holding, that the tying arrangement was per se unlawful. It further acknowledged that Sinclair's termination of the lease and the sales agreement with Osborn was in furtherance of that unlawful arrangement. The court nevertheless took the view that because there was in this case no concerted action or attempted monopoly, and because the cancellation was not "unreasonable," there could be no recovery for the termination of the business relationship. The District Court's exposition of this theory is as follows:

> "Although the tying arrangement may be illegal per se, and give rise to criminal or civil action by the government or to private claims for damages such as those awarded under A above [for injury occurring prior to the refusal to deal], the termination of a dealership in furtherance of such a plan or arrangement is not per se a violation of the antitrust laws; such a termination will not give rise to a claim for treble damages unless it amounts to an unreasonable restraint of trade." 207 F.Supp. at 861.

And the court concluded:

> "In the light of all the circumstances, I find that the termination of the lease was not an unreasonable restraint of trade, was not a per se violation of the antitrust laws, and does not give rise to a claim for treble damages under those laws." 207 F.Supp. at 862–863.

No cases upholding this approach to damages under the antitrust laws were cited.[7]

For the reasons set forth below, we think that the District Court's position cannot be upheld. First, it is in direct conflict with the statutorily declared right to treble damages for injury to one's business caused by a violation of the antitrust laws. Second, it is flatly opposed to many cases limiting a seller's right of customer selection when the seller has a policy aimed at restraining trade.

I

■ Preliminarily, it cannot be overemphasized that the previous appeal in this case adjudicated that Sinclair was guilty of engaging in an unlawful arrangement in restraint of trade under the antitrust laws and that the refusal to continue dealing with Osborn was in furtherance of this unlawful conduct. The adjudication attained finality when certiorari was denied by the Supreme Court on June 19, 1961, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255. For the legal consequence of such an adjudication we turn to section 4 of the Clayton Act, 15 U.S. C.A. § 15, which provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * *" and recover treble damages. Undeniably the termination of Osborn's lease and of his dealer sales agreement constituted an injury to his business "by reason of" something forbidden in the antitrust laws. The statute on its face clearly entitles Osborn to recoup three times the amount of loss caused by Sinclair's refusal to continue dealing with him.

■■ Section 4 of the Clayton Act does not require that, to qualify as a basis for recovery, the injury to one's business shall take a particular form or be an "unreasonable" injury. True it is that under section 1 of the Sherman Act, the question of reasonableness is crucial

---

7. In its argument before this court, Sinclair goes even further than the District Court, and insists that a refusal to deal, even if in furtherance of a violation of the antitrust laws, can *never* be actionable absent monopoly or a conspiracy between the seller and others.

in determining whether certain conduct is unlawful, for only unreasonable restraints of trade violate the statute. But once it is established that an unreasonable restraint of trade exists—and tying arrangements are per se unreasonable—the issue in a private antitrust suit becomes one of causation, not "reasonableness." It is, as the statute plainly says, simply whether the injury was caused by something made unlawful by the antitrust laws.[8]

The treble-damage action under section 4 of the Clayton Act "supplements government enforcement of the antitrust laws," United States v. Borden Co., 347 U.S. 514, 518, 74 S.Ct. 703, 706, 98 L.Ed. 903 (1954). Or, as another court has put it, "The grant of a claim for treble damages to persons injured was for the purpose of multiplying the agencies which would help enforce the antitrust laws and therefore make them more effective." Kinnear-Weed Corp. v. Humble Oil & Refining Co., 214 F.2d 891, 893 (5th Cir. 1954), cert. denied, 348 U.S. 912, 75 S.Ct. 292, 99 L.Ed. 715 (1955). The limitation upon the recoverable damages in a private antitrust suit, such as was imposed by the court below, would in large measure frustrate this salutary purpose.

In many, if not most, private antitrust actions, the principal element of damage is precisely what we are now considering—the loss of profits caused by a refusal to deal.[9] If a seller, who is not a monopolist and who does not act in concert with co-conspirators, nevertheless is able to coerce buyers into a combination or arrangement whereby prices are fixed, or the sale of one product is tied to the sale of another, or dealing is required to be exclusive, and if that seller could refuse to deal with buyers unwilling to adhere to the unlawful arrangement without answering for the resulting losses, the effectiveness of the section 4 treble-damage suit as an enforcement measure would be to a great extent nullified. In this type of case, where the Government brings the action rather than the injured customer, the Government may obtain a decree limiting the seller's right to refuse to deal. United States v. Loew's Inc., 371 U.S. 38, 83 S. Ct. 97, 9 L.Ed.2d 11 (1962).[10] If the private treble-damage action is to be a similar vehicle for effective enforcement of the antitrust laws, if it "supplements government enforcement,"[11] it must likewise afford sanctions in such an action for the refusal to deal.

8. Virtue v. Creamery Package Mfg. Co., 227 U.S. 8, 24, 33 S.Ct. 202, 57 L.Ed. 393 (1913); Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Vines v. General Outdoor Advertising Co., 171 F.2d 487, 491 (2d Cir. 1948).

9. The loss sustained during the life of the unlawful agreement is in this case, as it could well be in others, purely incidental; the chief injury is occasioned by the termination of business relations, which Sinclair brought about in furtherance of the unlawful tie-in arrangement. Indeed, in many cases the only possible injury stems from an unlawful refusal to deal, where there has been no prior experience whatever of business transactions between the parties.

10. The Loew's case is very much in point here, for it involved tying arrangements concededly without any monopolization or conspiracy. The Court there held that several distributors of films for television were guilty of unlawful tying arrangements when they conditioned the sale of certain desirable films upon the purchase of others less desirable. The Court pointed out, 371 U.S. at p. 40, 83 S.Ct. at pp. 99–100, 9 L.Ed.2d 11:

"No combination or conspiracy among the distributors was alleged; nor was any monopolization or attempt to monopolize under § 2 of the Sherman Act averred. The sole claim of illegality rested on the manner in which each defendant had marketed its product. The successful pressure applied to television station customers to accept inferior films along with desirable pictures was the gravamen of the complaint."

The decree in Loew's limited the distributors' right to refuse to deal to situations not involving unlawful tying arrangements.

11. United States v. Borden Co., 347 U.S. 514, 518, 74 S.Ct. 703, 98 L.Ed. 903 (1954).

At any rate, the language of section 4 unequivocally awards treble damages for all injuries caused by an antitrust violation, and since Osborn suffered a cancellation of his dealership because of the violation, he is entitled to compensation therefor. There is no justification in antitrust law or in the general law of damages for limiting recovery to losses sustained before the break in business relations. Where the customer is cut off in a coercive attempt to further a forbidden arrangement for a "fenced off market," Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 11, 12, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), he is entitled to recover all damages issuing from that punitive action. To deny him this would eviscerate section 4.

## II

Not only is the decision under review inconsistent with the language and purpose of section 4 of the Clayton Act, but its rationale finds no support in the reported cases. The doctrine of United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), that a single trader is free to select his customers as he sees fit, which the court below invoked, has no application to the instant case. First of all, the area of permissible refusals to deal is not as broad as the District Court's opinion would have it. Moreover, and completely aside from the scope of a seller's right of customer selection, this defense relates to the lawfulness of the seller's conduct and not to the measure of damages recoverable for conduct the unlawfulness of which has been adjudicated.

The right of a businessman to pick his customers, sanctioned by the Colgate case, was most recently reviewed by the Supreme Court in United States v. Parke, Davis & Co., 362 U.S. 29, 44, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). There the Court indicated that if a seller does no more than announce a policy designed to restrain trade, and declines to sell to those who fail to adhere to the policy, he has not put together a combination or arrangement violative of the antitrust laws. However, the Court emphasized that if the seller goes further, if he engages in actions extending beyond the bare announcement of his policy and the declination to sell "and he employs other means which effect adherence" to his policy, he has engaged in a combination or arrangement condemned by the antitrust laws. He can then no longer rely upon his "right" of customer rejection.[12] There is no indication in Parke, Davis, or in any other case, that these principles regarding refusals to deal vary, depending upon whether there is a monopoly or concerted action with co-conspirators, or whether, on the other hand, there exists some other form of arrangement in restraint of trade. To the contrary, irrespective of monopoly or conspiracy, if the seller pressures his customers or dealers into adhering to resale price maintenance, or exclusive dealing or tie-ins, he has put together an unlawful arrangement and taken himself outside the narrow protection afforded by Colgate. See, e. g., United States v. Schrader's son, Inc., 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471 (1920); Englander Motors, Inc. v. Ford Motor Company, 267 F.2d 11 (6th Cir. 1959); George W. Warner & Co. v. Black & Decker Mfg. Co., 277 F.2d 787 (2d Cir. 1960).[13] And see particularly our first opinion in the instant case, hold-

12. The right of customer selection sanctioned by Colgate must not, as Parke, Davis shows, be taken in its literal generality. The appellee bases too much on Colgate, without taking into account qualifying pronouncements in later decisions, which are not less canonical.

Illustrating just how limited is the permissible refusal to deal where the seller's policies are designed to restrain trade, the Second Circuit recently said,

George W. Warner & Co. v. Black & Decker Mfg. Co., 277 F.2d 787, 790 (2d Cir. 1960): "The Supreme Court has left a narrow channel through which a manufacturer may pass even though the facts would have to be of such Doric simplicity as to be somewhat rare in this day of complex business enterprises."

13. In Schrader's, supra, at pp. 99–100, 40 S.Ct. at p. 253, 64 L.Ed. 471, the Court made it clear that when a seller,

ing that upon the facts found by the District Court Sinclair could not justify its refusal to deal with Osborn upon the principle of free customer selection, Osborn v. Sinclair Refining Co., 286 F.2d 832 (1961).

■ Not only was it error to expand the scope of the Colgate defense beyond that sanctioned by prior decisions, including our own in this case; but it was inappropriate even to consider the proffered defense when the issue involved only the damages recoverable for conduct adjudicated to be in furtherance of an illegal tying arrangement. The defense predicated upon Colgate, that a seller having a policy of resale price maintenance, exclusive dealing, tie-in sales, etc., nevertheless has a qualified right to deal with whomever he wishes, is material to the question of whether the seller has put together an arrangement in violation of the antitrust laws. This defense of freedom to select one's customers is also relevant to the issue whether a par-

ticular refusal to deal was in furtherance of an unlawful arrangement or whether it was instead motivated by other considerations.[14] However, the defense had no bearing on the issue of recoverable damages stemming from a refusal to deal which was part and parcel of an antitrust violation.

■ Cases relied upon by Sinclair in its attempt to raise the Colgate shield involve either the question whether there existed an unlawful arrangement or the question whether the particular refusal to deal was to further such an arrangement.[15] In the instant case, however, both of these questions had been answered in the affirmative. On the other hand, no case has been cited to us, and our research has revealed none, holding that a refusal to deal may be immune in spite of the fact that the seller has violated the antitrust laws and that the refusal to deal was in furtherance of that violation. The cases are unanimously to the contrary. They show without exception that dam-

through a course of dealing undertakes to bind his customers to a policy in restraint of trade, he has put together a combination or arrangement in violation of law:

"It seems unnecessary to dwell upon the obvious difference between the situation presented when a manufacturer merely indicates his wishes concerning prices and declines further dealings with all who fail to observe them, and one where he enters into agreements—whether express or implied from a course of dealing or other circumstances—with all customers throughout the different States which undertake to bind them to observe fixed resale prices. In the first, the manufacturer but exercises his independent discretion concerning his customers and there is no contract or combination which imposes any limitation on the purchaser. In the second, the parties are combined through agreements designed to take away dealers' control of their own affairs and thereby destroy competition and restrain the free and natural flow of trade amongst the States."

It is clear from the Schrader's, Englander, and Warner cases, as well as many others, that if the seller imposes a trade restraining arrangement upon his customers, whether they be willing or reluctant, the seller has acted outside the

protection of Colgate. Contrary to the theory adopted in the instant case, there need not be a concert of action among several sellers, or a conspiracy between the seller and customers who actively assist the seller in securing adherence to his policy of suppressing competition. If the arrangement or combination between the seller and his dealers is put together through the coercive tactics of the seller alone, this is sufficient.

14. See, e. g., House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867 (2d Cir. 1962), where the refusal to deal was not in furtherance of the seller's unlawful discrimination under the antitrust laws, but, instead, was caused by the fact that the buyer had instituted a suit against the seller.

15. See, e. g., Nelson Radio & Supply Co. v. Motorola, Inc., 200 F.2d 911 (5th Cir. 1952), cert. denied, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); McElhenney Co. v. Western Auto Supply Company, 269 F.2d 332 (4th Cir. 1959); House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867 (2d Cir. 1962); Timken Roller Bearing Company v. F. T. C., 299 F.2d 839 (6th Cir.), cert. denied, 371 U.S. 861, 83 S.Ct. 118, 9 L. Ed.2d 99 (1962).

ages may be recovered for a refusal to deal in furtherance of an arrangement condemned by the antitrust laws, whatever form of trade restraint the arrangement takes.[16] Although most, but not all, of these cases did in fact involve monopoly or conspiracy, as opposed to non-monopolistic or non-conspiratorial arrangements in restraint of trade, the courts made absolutely nothing of any such distinction.

We conclude that Osborn is entitled to recover the damages flowing from Sinclair's cancellation of his lease and of his dealer sales agreement. This holding is required by the language of section 4 of the Clayton Act, is consistent with the purpose of the treble-damage provision, and is dictated by the many cases awarding damages for refusals to deal where customers would not go along with arrangements in restraint of trade.[17]

The District Court's finding that Osborn's actual damages stemming from Sinclair's unwillingness to continue dealing with him were $12,000 is not clearly erroneous. Trebled, this amounts to $36,000. Thus, adding the $975 treble damages allowed for injury occurring prior to the refusal to deal, Osborn is entitled to a judgment for $36,975 in damages. The District Court, upon remand, should determine what, if any, additional attorneys' fees should be awarded Osborn's counsel for their successful prosecution of the second appeal.[18]

Reversed and remanded.

16. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); William Goldman Theatres, Inc., v. Loew's Inc., 150 F.2d 738 (3d Cir. 1945), reported further in 3 Cir., 154 F.2d 66 (1946), 3 Cir., 163 F.2d 241 (1947), 3 Cir., 164 F.2d 1021 (1948), cert. denied, 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948); Emich Motors v. General Motors Corp., 181 F.2d 70 (7th Cir., 1950), modified, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (1951) (tying arrangement unilaterally imposed by General Motors upon its dealers, with a refusal to continue selling to a dealer unwilling to adhere); Standard Oil Company of California v. Moore, 251 F.2d 188 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958); North Texas Producers Ass'n v. Young, 308 F.2d 235 (5th Cir. 1962), cert. denied, 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed. 2d 733 (1963).

17. Nor would it be a defense to Sinclair that it had a contractual right, under the written lease and written sales agreement, to terminate the relationship on May 31, 1956. A refusal to deal based upon a contract provision is, in respect to the antitrust laws, no different from the right of traders generally to select their customers. In either case, the right is limited to situations where the seller has not put together an arrangement in restraint of trade. As the Sixth Circuit has pointed out, Englander Motors, Inc. v. Ford Motor Company, 267 F.2d 11, 15 (1959):

"There is nothing intrinsically wrong with a short notice cancellation provision unless by its exercise Ford was able to coerce violations, and by its use had forced Englander to sell its business. * * * [But] the use of a short term cancellation provision for the purpose of violating the law is itself a violation of the anti-trust law."

See also, Vines v. General Outdoor Advertising Co., 171 F.2d 487, 491 (2d Cir. 1948), where the court, by Judge Learned Hand, pointed out with his customary clarity that in spite of a contractual provision reserving to the seller the right not to deal, the buyer could recover for a refusal to deal in furtherance of an antitrust violation, as the contractual provision "gave the defendant no more immunity from that tort than from any other tort."

18. We have summarized the facts here as they were found by the District Court in the original trial and as set forth in detail in our first opinion, without undertaking to answer contrary inferences treated as facts in the dissent.

Nor have we undertaken to answer points in the dissent which represent a view of the law rejected in the first opinion of this court and at variance even with Sinclair's contentions on this appeal. Sinclair does not on this appeal dispute our prior holding that there existed an

HAYNSWORTH, Circuit Judge (dissenting).

I am unpersuaded that the views of my Brothers are correct. Though respectful of their views, I am impelled to dissent.

This is no ordinary refusal-to-deal case in which the whole answer is clearly illumined once the case is properly placed with reference to the line that marks the difference between Colgate [1] and Parke-Davis.[2] Nor is it a case for a mechanical application of the usual rule that damages flowing proximately from a violation of the antitrust laws are recoverable in a civil action. The tie-in arrangement involved is not the usual one, lacking both fairness and economic justification, and the legal consequences of its employment need not be considered without regard to its unusual redeeming qualities. This is not a case in which the asserted right is advanced defensively for the protection of small dealers against the predatory acts of giant suppliers; the asserted right is advanced as a sword to eviscerate the rights of a patient supplier for the unjust enrichment of a studiously and aggressively disloyal dealer.

I have little quarrel with the legal principles advanced by the majority. Our differences stem originally from the difference in the perspectives from which we view largely undisputed facts. The facts, which so greatly influence our judgments, need some restatement from the point of view of the dissenter.

Sinclair was a well-established but far from dominant distributor of petroleum products for industrial, home and automotive uses.[3] It was also a distributor of TBA to such an extent that there was evidence that Goodyear TBA had become "synonymous" with Sinclair. Earlier, it had comparable arrangements with Firestone, but at the relevant times, it was operating under contracts, originally negotiated in 1944, with Goodyear. Under these, contracts, it purchased tires, tubes and batteries from Goodyear, upon orders from its franchised dealers, and resold them to its dealers. On other accessories ordered through it, it received commissions of 5–10% from Goodyear on sales to Sinclair dealers.[4] In the written agreements with Goodyear, it was explicitly stated that Sinclair would assist Goodyear solicitation of Sinclair dealers, but assumed no obligation to do more, and it was expressly understood that Sinclair would not bring pressure of any kind upon any of its dealers who did not buy Goodyear TBA. At the same time, Goodyear reserved the right to make direct sales to Sinclair dealers, particularly those Sinclair dealers who were existing customers of Goodyear, without obligation to Sinclair.

Sinclair's arrangements with Goodyear display a concern for the independence of

---

unlawful arrangement whereby the sale of TBA was tied both to the sale of gasoline and to the lease of the station and that it refused to deal with Osborn partly because he did not abide by this arrangement. Sinclair frankly acknowledges this to be a case of refusal to deal but seeks to justify its conduct on the Colgate doctrine. This contention has been answered in the foregoing paragraphs and we deem it unnecessary to answer other contentions advanced in the dissenting opinion going beyond those raised by the parties.

1. United States v. Colgate & Company, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992.

2. United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505.

3. It is important to remember that the District Court found, with abundant support, that Sinclair had no monopoly power, engaged in no conspiracy or attempt to monopolize, and did nothing to unreasonably restrain trade in any product.

4. During the Sherwood era, Sherwood did not purchase tires, tubes or batteries, but received commissions on purchase orders for those goods, routed through it by its dealers, as Sinclair did on other accessories. Sherwood passed from the picture in 1955, however, and the governing Goodyear agreements at the time of the cancellation were Sinclair's, not Sherwood's.

Sinclair dealers and for independently established business relations between Sinclair dealers and Goodyear. Still, it is hardly to be denied that under the Goodyear agreements, in effect for many years, Sinclair was a distributor of TBA as it was a distributor of petroleum products. It was not engaged in the manufacture of TBA, but it does not appear, either, that it was the producer of all of the petroleum products it distributed. Unquestionably, its major business was the distribution of petroleum products, but it was also engaged in the related and ancillary business of distributing TBA through substantially the same retail outlets supplying petroleum products to the automotive trade.

That it was a distributor of TBA as well as of petroleum products is demonstrated by the history of its relations with the plaintiff, Osborn. That history introduces Sinclair's role as lessor which underlies my difference with the majority.

In 1932, Sinclair[5] controlled and operated, as lessee, a service station in the downtown section of Reisterstown, in Baltimore County, Maryland, said to be the most desirable service station site in the area. In that year, it employed Osborn as an attendant at that service station. Later he became its manager, and, in 1936, its sublessee. Osborn continued to operate that station as Sinclair's lessee until May 31, 1948, when the first lease was effectively cancelled. Before the cancellation date of the first lease, however, a second lease, on a year to year basis, had been negotiated, and that lease became effective on June 1, 1948.

Contemporaneously with the execution of the second lease on May 4, 1948, the parties executed a "Dealers Sales Agreement," which, in effect, was a requirements contract by which Sinclair agreed to sell and Osborn agreed to purchase his requirements of Sinclair's petroleum products for resale on the leased premises. At the same time, as more fully disclosed in the earlier opinion of this Court, Osborn placed a substantial order for Goodyear TBA, and there was an understanding that he would purchase in the future larger quantities of Goodyear TBA than theretofore.

In 1953–4, the old service station building was demolished and a new modern building and facilities were erected and installed in the place of the old at a cost to Sinclair in excess of $31,000. The new building and facilities included space and equipment for the storage, handling, sale and installation of TBA as well as of petroleum products. It was not constructed just as a gasoline filling station, but as a retail outlet for TBA as well as of automotive petroleum products.

Under the lease, however, the rental payable by Osborn to Sinclair was computed at the rate of 1½ cents per gallon of motor fuels sold. There was a provision for a minimum monthly rental of $400, but that provision was never enforced. Under the lease, Osborn paid no rental measured by his sales of TBA at the service station or by Sinclair's cost of the space, facilities and equipment provided him for the conduct of the TBA business. However, it is plain that Sinclair expected some return on the TBA business conducted on the premises by reason of anticipated purchases by Osborn through it of Goodyear TBA, with respect to which Sinclair had a gross return of ten per cent.

When, therefore, Sinclair spent substantial capital funds to provide space and equipment for the retail marketing of the TBA it distributed, and undertook to distribute TBA to all of its automotive outlets for petroleum products, it seems unrealistic to say that Sinclair was in the business of distributing petroleum products but not TBA. It was in each of these related and complementary businesses.

Undoubtedly, cancellation of the first lease in 1948 was attributable in part to

5. Actually Sherwood, Sinclair's predecessor, but, for convenience, we refer to Sinclair whether the immediate actor was Sinclair or its predecessor-subsidiary, Sherwood.

Osborn's TBA operations. In 1946, he began the operation in Reisterstown of a Firestone store, in which he handled a full line of Firestone TBA. Later, in 1950, he opened another Firestone store in Westminster. Because of his operation of the Firestone stores, he could earn quantity discounts from Firestone, unavailable from Sinclair, if he utilized the service station as an adjunct to his Firestone stores and as an additional outlet for his Firestone TBA. That, he did. It abundantly appears that at the service station he aggressively promoted the sale of Firestone TBA, and that he did not aggressively press the sale of Goodyear TBA. At one time he agreed to carry both and let his customers choose between them, an arrangement which was acceptable to Sinclair. Osborn did not perform that agreement, as clearly appears from the fact that his sales of Firestone TBA at the service station continued at a rate ten times larger than his sales of Goodyear TBA.[6] It is thus plain that Osborn was using Sinclair's service station as an additional outlet for his Firestone stores in competition with his lessor, which was in the competing business of distribution of Goodyear TBA.

That Osborn's primary concern after 1946 was his Firestone TBA business is illustrated by his insistence that, after his second lease was cancelled in 1956, he could not accept another available service station for it "would not have been suitable for [my] TBA business." Some months later, in 1957, he did obtain a lease of a Shell station, approximately half a block from the Sinclair station he had previously operated. The Shell station, he said, was a less desirable location as a retail outlet for gasoline, but it was "suitable" for his Firestone TBA business, and, since, he has operated that as another retail outlet for his Firestone stores as well as a retail outlet for Shell gasoline.

Osborn's sales of gasoline peaked in 1946, reaching a level in that year he never again approached. It was in that year he opened the first of his competing Firestone stores. The facts that his gallonage sharply declined thereafter and that he bought so little Goodyear TBA led to the cancellation of the first lease. Upon his importunities, however, he was given a "second chance" to do better, and the second lease with the related petroleum requirements contract and TBA understanding were concluded. Though Osborn apparently continued as before, Sinclair, in an effort to improve the productivity to it of its real estate, spent in 1953–4 $31,000 of its funds in the construction of a new gasoline-TBA service station. Osborn's sales of gasoline and Goodyear TBA did not thereafter attain the expected improvement. In 1955, in fact, Sinclair suffered a net rental loss of $1,586.00 on the Osborn service station; that is, its costs as primary lessee exceeded by that amount its rental receipts from Osborn, its sublessee.

Sinclair would not have suffered such rental losses if Osborn had sold more Sinclair gasoline or it would have been compensated for them if Osborn had sold, from the service station, more Sinclair-Goodyear TBA. Whether his disappointing gallonage was due to preoccupation with his Firestone TBA business conducted at his two Firestone stores and at Sinclair's service station, we need not speculate, but the fact is, as the District Court found, that Sinclair was abundantly justified in believing that Osborn was selling too little gasoline and too little Sinclair-Goodyear TBA on the leased premises. It, therefore, cancelled the lease.

The humans who represented Sinclair could not disassociate in their minds the separate phases of Osborn's shortcomings, and they did not undertake to do so. However poor his performance as a retailer of Sinclair's gasoline, his abys-

---

6. There is no suggestion that Firestone enjoys any such public acceptance over Goodyear that, if a choice were given each customer, any such ratio of sales could have resulted.

mal performance as a retailer of Sinclair-Goodyear TBA could not but have affected their judgment. Necessarily, this was the case in 1948, when the effect of his competing interest in Firestone TBA was apparent, and in all subsequent years. Whether Sinclair acted in 1948, 1956, 1957, or any subsequent year to reclaim its real estate for the purposes for which it acquired it, it could not be expected to act on the basis of Osborn's indifference in the marketing of Sinclair gasoline without regard to his aggressive antagonism in the marketing of Sinclair-Goodyear TBA.

Under these circumstances, questions arise which require answers which are not supplied by reference to usual refusal-to-deal cases or to cases of unmitigated tie-ins. No one disputes the fact that Sinclair acquired and developed this service station site, at considerable expense to itself, as a retail outlet for its products. Everyone agrees that Sinclair in 1948, or in any year thereafter, could lawfully have terminated Osborn's lease because of his indifference to Sinclair's interest. The question then is whether § 1 of the Sherman Act prevents a lessor's resort to his contractual rights because his lessee compounds indifference to, and neglect of, the interests of his lessor with aggressive defiance of the lessor and its interest. The opinion of the majority does not face the question, but is its teaching that a lessee may obtain legal occupancy of his lessor's premises upon representations of his intention to serve the lessor's purposes and, thereafter, by aggressive diversion of the lessor's real estate to the incompatible purposes of the lessee, gain the right to dwell in the house of the lessor forever, or for a period of time to be determined by a court?

This is not the kind of tying agreement which serves "hardly any purpose beyond the suppression of competition."[7] Sinclair acquired control of the site and spent substantial sums improving it for the purpose of employing it as an effective retail outlet for the petroleum and TBA products it distributed. That was a lawful purpose, and there was nothing unlawful in the undertaking to realize it through a sublease to an operator whose anticipated profits would provide an effective incentive for efficient operation and sales promotion. Sinclair's lawful purpose would be thwarted, however, if the lessee were free to devote Sinclair's real estate to purposes inconsistent with or antagonistic to Sinclair's.

Thus the petroleum products requirements contract was executed at the same time as the lease. That requirements contract has not been attacked by the plaintiff, though if Osborn had been operating on premises in which Sinclair had no interest, the requirements contract would be illegal under the explicit holding of Standard Oil Company of California v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371. It has not been attacked here or elsewhere, for the fact that the supplier, as owner of the fee or primary lessee, controls the real estate makes a large and obvious difference. A supplier cannot lawfully, through requirements contracts, exclude its competitors, from retail outlets owned and controlled by its customers; it can do so from retail outlets owned and controlled by it and operated by its lessees. Thus if Osborn had undertaken to use Sinclair's service station for the retail marketing of Standard Oil's gasoline, rather than Sinclair's, no one suggests that Sinclair could not, for that reason, have exercised its contractual right to cancel the lease at the expiration of the current term.

The TBA understanding is in precisely the same posture as the petroleum products requirements contract. The 1948 lease would not have been executed without it. The only difference is that here there was no requirement of exclusivity. The lessee was free to deal in competing TBA products and was required only to

---

**7.** Standard Oil Company of California v. United States, 337 U.S. 293, 305, 69 S.Ct. 1051, 93 L.Ed. 1371.

handle a reasonable amount of Sinclair distributed Goodyear TBA. Surely, however, the vague and relaxed requirements of the TBA agreement do not bring it into conflict with the antitrust laws when the gasoline requirements contract is not invalidated by its stringent, exclusive terms.

Incidentally, it may be observed that the record is devoid of any basis for a suggestion that there was any tie of TBA to the sale of gasoline, or other petroleum products. In our earlier opinion it was said that the "TBA was tied to the lease and the sale of the gasoline," which is true in the sense that they were all of the same package, but it is clear that the only tying product was the real estate and its lease. TBA and gasoline were tied to each other only in the sense that each was tied to the lease. Gasoline and TBA were tied products. Neither was a tying product. The plaintiff, indeed, has not claimed that the sale of TBA was tied to the sale of gasoline. He positively affirms the absence of any such tying agreement. He does say that TBA was tied, or attempted by Sinclair to be tied, to the lease, and that is true. Thus, with respect to the tying agreements, TBA and gasoline stood in the same relationship to the lease, and, except that gasoline was more closely tied, the companion agreements are indistinguishable.

Indeed, there is no suggestion in the record that Sinclair ever refused to sell gasoline to Osborn, or that it would not willingly have sold him all the gasoline he would buy for resale on premises controlled by him, and without reference to TBA. All that Sinclair did was to terminate the lease and the related agreements for the supply of merchandise to be resold on the leased premises. Sinclair repossessed its real estate, which it thought, with reason, Osborn had been misusing. It did nothing more.

Under these circumstances, and I see no real room for dispute over the facts, I would have found no violation of the antitrust laws were it not for Sinclair's coercive pressures upon Osborn, during the term of the lease, in an effort to exact from him a more definite commitment as to TBA and to enforce the agreement it obtained.[8] If, however Sinclair ought not to be allowed, during the term of the lease, to coerce acceptance and performance of a more definite agreement more favorable to Sinclair. Osborn's complete remedy is the recovery of the provable damages he suffered because of his partial, but niggardly, performance of the exacted agreement. Sinclair's wrong, relatively trivial in comparison with Osborn's, gave Osborn no vested right to continue his misuse of Sinclair's real estate, beyond the term of the lease.

If, as appears to me, the original tie of TBA to the lease stands on the same legal footing as the original tie of gasoline to the lease and neither was unlawful, Sinclair had a right to condition a renewal of Osborn's lease upon his acceptance of a new TBA agreement providing greater protection for Sinclair's interest and assuring Osborn's observance of it. Sinclair acted prematurely and, because it did, damages are being imposed upon it,

---

8. That agreement was to carry both Goodyear and Firestone TBA and let each customer choose between the two.

A reader of the opinion on the first appeal may find in it more than I indicate. Many conferences and a voluminous correspondence among the members of the panel which heard the first appeal influence my understanding of what was intended to be decided on the first appeal. All of that may now be irrelevant, and I accept the result of the first appeal. The present issue of Sinclair's liability for damages flowing from the lease cancellation, however, involves more than the quantum of the damages. Resolution of the substantive issue should be governed by the facts as they appear in the record, and our view of them need not be limited by what was said or not said in the first opinion. In dealing with them and their legal consequences, as I see them, I have not felt required to conform my statement of the record facts and of my present views to everything that was said in all of its possible implications in the first opinion. Indeed, with the same case now before us again, we are free to modify in any appropriate way anything said in the first opinion.

but having been penalized for its haste, it ought not to be deprived of its contractual rights, the exercise of which offends no law. If, one month before the expiration of Osborn's lease, Sinclair had physically seized the service station and excluded Osborn from it, Osborn would have been entitled to the damages he suffered during the remaining month of the term, but to no more. Such a wrong by Sinclair would not have conferred upon Osborn a right to a renewal of the lease. Though Sinclair's wrong here be termed a violation of the antitrust laws, its later cancellation of the lease was not its product, and denial of its lawful, contractual rights, is not an appropriate penalty.

While one of the coercive measures employed by Sinclair was a threat to cancel the lease, cancellation of the lease was not a product of the threat. The threat and the cancellation were products of Osborn's misuse of the real estate. If the threat was a premature excess for which Sinclair must make recompense, it did not inject illegality into the cancellation. Had there been no threat, Sinclair would have had the unquestioned right to cancel the lease at the end of the current term. A premature, conditional statement of an intention to exercise the legal right does not work a forfeiture of the right.

In Dantzler v. Dictograph Products, Inc., 4 Cir., 309 F.2d 326, we recently dealt with a somewhat similar problem. At a time when it had two dealers in Charlotte, it supplied services to one which it did not offer the other, Dantzler. Shortly thereafter it terminated Dantzler's agency. The discrimination in services we held to be a violation of the antitrust laws and Dantzler was allowed to recover the damages he sustained by reason of the discriminatory acts. He was not allowed to recover damages flowing from the termination of his agency, however. Though the termination of his agency was a much more obvious discrimination than the offer of disparate services and its effect upon Dantzler much more calamitous, Dictograph had a right to terminate and its previous violation of the antitrust laws did not make unlawful its exercise of that right.

Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534, is inapposite. There, a dealership was cancelled in furtherance of a conspiracy in restraint of trade, an offense for which General Motors had previously been criminally convicted. The Supreme Court was concerned only with an evidentiary question, but it left in effect a judgment awarding damages arising out of the cancellation. Unlike the tie-ins here, however, the criminal conspiracy was without legal or economic justification. It had no redeeming qualities. The cancellation, there, was the product of the conspiracy, while the cancellation of the lease here was the product not of Sinclair's efforts prematurely to coerce Osborn, but of Osborn's misuse of Sinclair's real estate. Emich, of course, involved no question of limitations upon a landowner's use of his own real estate.

I find nothing in the antitrust laws which prevents the owner of real estate from insisting it be devoted to the lawful purposes of the owner. If the owner overreaches himself by compelling a modification of the agreement during the term of a lease it may be liable for those damages immediately flowing from its overreaching, but it does not lose its right, at the end of the term of the lease, to repossess its own real estate and redevote it to the purposes for which it had been acquired and improved. Particularly, in the light of Osborn's aggressive diversion of the real estate to the service of his conflicting interests and his consistent subordination of the interests of the lessor, I find no basis for a conclusion that the lessor had no right to cancel the lease in accordance with its terms.

I, therefore, dissent.