BARBER & ROSS CO., Appellee,

v.

LIFETIME DOORS, INC., Appellant.

BARBER & ROSS CO., Appellant,

v.

LIFETIME DOORS, INC., Appellee.

Nos. 86–1535, 86–1538.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 12, 1986.

Decided Jan. 30, 1987.

E. Barrett Prettyman, Jr. (Susan S. De-Santi, Meg Hackett Carrier, Hogan & Hartson, Washington, D.C., on brief), for appellant.

Steven R. Kuney (David Povich, Mark S. Levinstein, Cherry Joy Beysselance, Williams & Connolly, Washington, D.C., on brief), for appellee.

Before WINTER, Chief Judge, HALL, Circuit Judge, and McMILLAN, United States District Judge for the Western District of North Carolina, sitting by designation.

HARRISON L. WINTER, Chief Judge:

Defendant Lifetime Doors, Inc. (Lifetime) appeals from a judgment entered by the district court on a jury verdict in favor of plaintiff Barber & Ross Co. (B & R) for $2.1 million. The jury found for B & R on its claims of antitrust violations and breach of contract. As a prevailing plaintiff in an action under the Clayton Act, B & R subsequently submitted an application for attorneys' fees and costs of suit, including a request for expenses arising from its use of expert witnesses. The district court denied B & R's request for expert expenses and B & R cross appeals from that ruling.

We conclude that there was sufficient evidence to support the jury's verdict based on the antitrust violation and the breach of contract claim. We also conclude that the district court acted within its discretion in denying the request for expert expenses. We therefore affirm.

I.

B & R's business is the purchase of millwork products, including doors, from manufacturers, preparation of them for installation in new homes, and sale of them to new home builders, primarily in the state of Virginia. Lifetime is a large manufacturer of doors, including plain rectangular doors, known as flush doors, and doors with molded hardboard outer layers, known as six-panel doors, common in Colonial style homes. In 1982, B & R began to buy flush doors and six-panel doors from Lifetime to include in its millwork packages.

Taking the evidence in the light most favorable to B & R, the prevailing party, there was the following proof regarding the course of dealing between B & R and Lifetime. In early 1983, a sales representative for Lifetime approached B & R to urge B & R to shift all its door purchases to Lifetime so as to constitute Lifetime its exclusive supplier. The sales representative provided B & R with sales literature which offered prospective purchasers the opportunity to join Lifetime's VIP Club. These writings promised new purchasers "continuous production availability ... in full proportion to monthly needs" which would ensure that purchasers could "order flexible quantities" in shipments of a "desired number." The President of B & R secured an oral commitment from Lifetime that Lifetime would supply B & R's requirements of four truckloads of six-panel doors each month, in return for which B & R would purchase doors exclusively from Lifetime. The oral agreement was made in Virginia where B & R conducts most of its business.

From the middle of March to the middle of May of that year, B & R purchased both flush and six-panel doors exclusively from Lifetime pursuant to their agreement. In May, B & R began to purchase six-panel doors from other manufacturers after Lifetime advised B & R that a shortage of six-panel doors would limit Lifetime's ability to supply B & R with six-panel doors and suggested that B & R make purchases from other suppliers. Then in July, Life-

time instituted an "allocation system" which tied the number of six-panel doors a customer could purchase to the number of flush doors that the customer bought. Lifetime's president told his sales people that Lifetime was no longer willing to sell six-panel doors to customers that bought their flush doors from competitors.

Lifetime's decision to tie sales of flush doors to sales of six-panel doors forced its customers substantially to alter the mix of flush and six-panel doors that they purchased. By August, the allocation system was forcing B & R to purchase three flush doors for each six-panel door that it ordered. Moreover, this pattern of increased purchases of flush doors from Lifetime occurred at a time when the demand for flush doors was declining.

Lifetime informed its customers that the reason for its new allocation system was a shortage of the hardboard outer layers (skins) which were necessary for the manufacture of six-panel doors. B & R presented evidence that no shortage actually existed. Lifetime actually possessed a greater number of skins than it had historically ordered from its own supplier. Lifetime held back thousands of six-panel doors from the market while it told customers that a shortage of doors required it to tie sales of flush doors to sales of an allegedly limited supply of six-panel doors.

In September, 1983, the parties terminated their relationship. Lifetime contended that it ceased shipping doors to B & R when B & R stopped paying its bills for past shipments. B & R's President testified that Lifetime refused to ship further quantities of six-panel doors to B & R after B & R threatened to file suit to challenge the allocation system. B & R also contended that Lifetime refused to deal further with B & R because Lifetime needed to use its supplies of six-panel doors to force other customers, including prospective new customers, to purchase more flush doors. Thus, Lifetime terminated the contractual relationship with B & R as a direct consequence of Lifetime's anticompetitive allocation system.

During the damage phase of the trial, B & R provided evidence that the allocation system had a deleterious effect on its business. Lifetime's policy of tying sales of flush doors to those of six-panel doors caused B & R to purchase flush doors it did not need. As a result, B & R was forced to pay for storage of flush doors until they could be used. In addition, B & R received significantly fewer six-panel doors than it needed during July and August. After its contract with Lifetime was terminated, B & R received no more six-panel doors from Lifetime. Despite B & R's attempts to mitigate losses, it was forced to deliver many of its millwork packages without six-panel doors that its customers had ordered. Some of B & R's customers cancelled their orders when this happened and began purchasing packages from other millwork suppliers.

Based on these facts, the jury awarded B & R $728,597 on its claim that Lifetime breached the requirements contract between the parties. In addition, the jury awarded B & R $730,148 on its claim that Lifetime had established an anticompetitive tying arrangement that amounted to a per se violation of the antitrust laws and a violation of the antitrust laws under the rule of reason. The latter award was trebled pursuant to the damage provisions of the Clayton Act. These awards overlapped because the damages for both claims depended primarily on Lifetime's decision to terminate its supplier relationship with B & R so that the actual verdict was $2.1 million.

## II.

Initially, Lifetime challenges the verdict of the jury on the grounds that B & R lacked standing under the antitrust laws to assert its antitrust claims. Lifetime premises its argument on two contentions. First, Lifetime argues that a purchaser of a tied product—here flush doors are the tied product and six-panel doors the tying product—who is not a consumer in the tied-product market lacks standing to sue for damages due to excess purchases of the

tied product because this injury does not flow from an injury to competition. Second, Lifetime contends that B & R's claim that Lifetime's refusal to deal was pursuant to its anticompetitive scheme was too attenuated to support standing under the antitrust laws. We think that neither of these contentions has merit.

■ To bring a claim under the antitrust laws, a plaintiff must assert an "injury in his business or property by reason of any thing forbidden in the antitrust laws." 15 U.S.C. § 15; *Cargill, Inc. v. Monfort of Colorado, Inc.*, — U.S. —, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *Associated General Contractors, Inc. v. Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Brunswick v. Pueblo Bowl-o-Mat*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). A consumer in the tied product market who is forced to purchase unwanted supplies of the tied product in violation of the antitrust laws is unquestionably the victim of an antitrust injury. *Fortner Enterprises v. U.S. Steel Corp. (Fortner* I), 394 U.S. 495, 498–99, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969). *See* Statement of Rep. Mitchell, 51 Cong. Rec. 9090 (1914) ("[The Clayton Act] seeks to prevent exclusive 'tying' arrangements that have brought about a monopoly, alike injurious to the small dealers, to the manufacturers, ... to those who seek to enter the field of competition and to the millions of consumers.") Most recently, in *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), the Supreme Court reiterated that purchasers of a tied product are injured when an illegal tie coerces the buyer into

"the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Hyde*, 466 U.S. at 12–13 & n. 19, 104 S.Ct. at 1558–59 n. 19. Thus, B & R had standing under the antitrust laws because B & R established that it was forced to buy unwanted supplies of flush doors.[1]

A plaintiff may also bring an antitrust claim where the plaintiff has been injured because of a seller's refusal to deal with a buyer where this refusal furthers an anticompetitive tying arrangement. *Osborn v. Sinclair Refining Co.*, 324 F.2d 566, 571–73 (4 Cir.1963). A buyer who is injured due to a refusal to deal in furtherance of the seller's anticompetitive scheme has been injured as a direct result of an antitrust violation. *Id.* Such a party is in a position similar to the consumer in *Blue Shield of Virginia v. McCready, supra*, who was injured under the antitrust laws when he was denied a claim for insurance benefits to pay for psychological services pursuant to an anticompetitive scheme to promote psychiatric services. *See also Graphic Products Distributor, Inc. v. Itek Corp.*, 717 F.2d 1560 (11 Cir.1983) (antitrust injury from a contract termination pursuant to an illegal scheme); *Eiberger v. Sony Corp. of America*, 622 F.2d 1068 (2 Cir.1980) (same); *Arnott v. American Oil Co.*, 609 F.2d 873 (8 Cir.1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980) (same).

■ Lifetime's allocation system was only a slight variation on anticompetitive refusals to deal which have been condemned previously. Lifetime employed its

---

**1.** Lifetime contends that when B & R purchased flush doors that it would not otherwise have bought, there was no adverse effect on competition, citing *Hyde*, 466 U.S. at 16, 104 S.Ct. at 1560. B & R, however, was a regular purchaser of flush doors and was foreclosed from purchasing such doors from suppliers other than Lifetime due to Lifetime's tying arrangement. Even if B & R's purchases did not have an adverse effect on competition, B & R was nonetheless injured under the antitrust laws. As the passage from *Hyde* which Lifetime relies on suggests, the lack of an anticompetitive effect of a forced purchase on a purchaser may have a bearing on

whether the tying arrangement has had a substantial effect on commerce, a threshold requirement of per se condemnation. An anticompetitive effect is not a threshold requirement, however, for a purchaser to have *standing* under the antitrust laws. *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 481–82, 102 S.Ct. 2540, 2549–50, 73 L.Ed.2d 149 (1982). It is beyond dispute that a consumer in the market in which trade is illegally restrained who is injured by anticompetitive practices has standing to bring an antitrust claim. *Associated General Contractors*, 459 U.S. at 539, 103 S.Ct. at 909.

allocation system to restrict the sales of six-panel doors in order to increase sales of flush doors to B & R and other purchasers. B & R was unable to purchase sufficient quantities of six-panel doors due to its unwillingness to purchase the requisite number of flush doors. When B & R questioned the legality of Lifetime's allocation system, Lifetime terminated the requirements contract between the parties in order to effectuate its illegal arrangement. As a result, Lifetime's refusal to deal was an injury to B & R for purposes of antitrust standing.[2]

### III.

■ The jury found separate violations of the antitrust laws based on claims that Lifetime's tying arrangement were per se illegal and a violation under the rule of reason. We need not decide whether the defendant's allocation scheme was per se illegal, because adequate evidence supported the jury's conclusion that the allocation system unreasonably restrained competition. B & R met its burden under the rule of reason of demonstrating the actual effect of the tying arrangement on competition. *Hyde*, 466 U.S. at 29, 104 S.Ct. at 1567. B & R's expert testimony established the relevant geographic market for flush and six-panel doors. Once the relevant market was established for flush doors, evidence that Lifetime significantly increased its sales of flush doors after it imposed the tying arrangement, even though the market was in a state of decline, demonstrated that Lifetime had increased its market share. In addition, B & R presented evidence that Lifetime's stated justification for its allocation scheme—a shortage of six-panel doors—was a pretext for its anticompetitive intentions. Thus, B & R presented sufficient evidence to demonstrate that Lifetime's tying arrangement unreasonably restrained competition in the market for flush doors.

### IV.

Lifetime contends that there was insufficient evidence to support the jury's breach of contract verdict because the alleged contract was unenforceable under the statute of frauds and because there was insufficient evidence that an oral agreement to form a requirements contract had been reached. These contentions also fail to persuade us that the jury's verdict must be overturned.[3]

Under the Virginia statute of frauds, an enforceable contract for the sale of goods must be evidenced by a writing that indicates that the parties formed a contract signed by the party against whom enforcement is sought. Va. Code. § 8.2–201. The contract is not enforceable beyond the quantity of goods shown in writing. *Id.*

■ The written sales brochures given by Lifetime to B & R met the requirements of the statute of frauds. The writings met the signature requirement because the Lifetime Doors trademark appeared on the documents and that was sufficient to authenticate the documents. Va. Code § 8.1–201(39). The writings also stated a sufficiently definite quantity for purposes of the statute because they referred to meeting

---

**2.** The district court properly instructed the jury on its obligation to find an antitrust injury in order to return a verdict of liability during the liability phase of the trial. It was not prejudicial to Lifetime when the district court omitted providing a specific instruction that a refusal to deal constitutes an antitrust injury.

**3.** Lifetime points out that because the antitrust damage award depended primarily on termination of the contract with B & R (the refusal to deal), overturning the jury's verdict on the contract issues would also require reversal on the issue of antitrust damages. Even absent a legal-

ly enforceable requirements contract, however, B & R still presented sufficient evidence to demonstrate that Lifetime would have supplied substantially all of B & R's needs under a competitive allocation system. In fact, Lifetime in its memorandum in support of defendant's motion for judgment notwithstanding the verdict characterized B & R's evidence as demonstrating that under its agreement with Lifetime B & R would purchase a "large percentage of its needs from Lifetime," and Lifetime would fill all of the orders submitted by B & R for six-panel doors.

the purchaser's needs. Va. Code § 8.2–306 & official comment.

■ To avoid the proscription of the statute of frauds, a writing must provide "a basis for believing that the offered oral evidence rests on a real transaction." Va. Code § 8.2–201, official comment No. 1. The writing need not, however, conclusively establish the existence of a contract to survive the scrutiny of the statute of frauds. *Id.* The writings in this case promised that Lifetime would meet the monthly needs of B & R and thus were sufficient to support B & R's claim that an oral agreement was reached to form a requirements contract.

The evidence was sufficient to support the jury's verdict that such an oral agreement was reached. The testimony from the President of Lifetime indicated that at the initial meeting between the parties, the subject of the requirements contract was discussed. At a later meeting, the parties reached an agreement to form a requirements contract. There were some discrepancies in the testimony of B & R's witnesses, but their testimony was sufficiently consistent on the content of the meetings between Lifetime and B & R to support the jury's award.[4] Lifetime contested these claims, but the jury resolved the conflicts in the evidence and found that Lifetime had promised to meet all of B & R's needs for six-panel doors.

### V.

Once a plaintiff has demonstrated that he has been injured due to an antitrust violation, the plaintiff may prove the extent of damages under a relaxed standard of proof. *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). The courts have relaxed the standards for proving damages in antitrust cases because estimates of the extent of damage depend on reasonable projections of the position of the plaintiff's business in the absence of the antitrust violation. In addition, courts have noted that a wrongdoer should not insist on certain proof of the extent of an injury which the wrongdoer has caused. *Id.* We find that B & R's evidence met this standard of proof.

■ B & R presented expert testimony which supported its estimate of the extent of damages. For an estimate of the damages for 1983, records of B & R's projects, which were admitted into evidence, allowed the expert to identify the actual number of projects which were cancelled by customers because they did not receive six-panel doors. The 1984 estimate required more ingenuity. The estimate for damages to B & R depended on the expert's assessment that B & R lost business because customers who cancelled orders in 1983 never returned. B & R introduced evidence from its salesmen and project records to support this premise. The expert tailored his methodology in a reasonable manner to the evidence in the case in order to take account of the business that was lost to B & R.[5] *See Pierce v. Ramsey Winch Co.,* 753 F.2d 416, 439–41 (5 Cir.1985); *E. Berger v. Sony Corp. of America,* 622 F.2d 1068 (2 Cir.1980).

The estimates for 1984 assumed that all of the customers who left B & R in 1983

---

**4.** Lifetime also contends that the district court should have instructed the jury on the issue of whether Lifetime gave notice that it intended to terminate the contract. Va. Code §§ 8.2–309; 8.1–201. We agree with the district court that Lifetime's alleged notice was too equivocal to support a contention that it had validly terminated the contract. In addition, omission of this instruction was not prejudicial to Lifetime because a termination that is otherwise valid under Va. Code §§ 8.2–309 may still be unreasonable under the antitrust laws.

The district court also did not err by rejecting an instruction on the issue of consequential damages because the relevant provisions limiting damages were not contained in the requirements contract.

**5.** Based on 1983 figures, the expert calculated that each developer/customer of B & R produced twenty-five houses a month that would have been supplied by B & R. Based on that figure, the expert used the average price of B & R's packages to calculate lost sales. Using B & R's past profit rates, the expert derived a final figure for lost profits.

would have continued as customers of B & R in the absence of the antitrust violation. Thus, the plaintiffs estimates were generous, but not speculative. Moreover, the expert's projections were conservative in the sense that they omitted customers that were lost after 1983 and potential new customers that could not be serviced. The damage estimates were thus reasonable under the circumstances of the case.

## VI.

■ B & R, as a prevailing party under § 4 of the Clayton Act, cross appeals because the district court denied its claim for the costs of expert witnesses. Under § 4 of the Clayton Act, a prevailing party is entitled to recover "the costs of suit and a reasonable attorney's fee." 15 U.S.C. § 15. We agree with the prevailing view that "costs of suit" under § 4 does not include expert expenses except in cases of exceptional circumstances. *E.g., International Woodworkers of America, AFL–CIO v. Champion International Corp.*, 790 F.2d 1174 (5 Cir.1986); *Illinois v. Sangamo Construction Co.*, 657 F.2d 855 (7 Cir. 1981). *But see J.T. Gibbons v. Crawford Fitting Co.*, 760 F.2d 613 (5 Cir.), *cert granted,* — U.S. —, 107 S.Ct. 568, 93 L.Ed.2d 573 (1986).[6] We adhere to the view that where Congress has desired that such expenses be recoverable, they have specifically authorized such recovery. *International Woodworkers, supra,* 790 F.2d at 1179 & n. 7; *Wheeler v. Durham City Board of Education,* 585 F.2d 618, 624 (4 Cir.1978).

A district court's decision as to whether exceptional circumstances justify an award of expert expenses is a matter of discretion. *E.g., Roberts v. S.S. Kyriakoula v. Lemos,* 651 F.2d 201, 206 (3 Cir.1986). We find no basis under the circumstances of this case for concluding that the district court abused this discretion.

**6.** *Gibbons* holds that a district court has *no* authority to award expert witness fees as costs of suit under § 4. 760 F.2d at 617. Although we disagree with this holding, we need not

AFFIRMED; COSTS ASSESSED AGAINST LIFETIME DOORS, INC.

reach the issue because the district court chose to exercise its discretion to reject an award of expert expenses.