**FONTANA AVIATION, INC., a Corporation, Plaintiff-Appellant,**

v.

**BEECH AIRCRAFT CORPORATION, a Corporation, and Hartzog-Schneck Aviation, Inc., a Corporation, Defendants-Appellees.**

Nos. 17734, 17735.

United States Court of Appeals, Seventh Circuit.

Sept. 23, 1970.

Francis J. McConnell, John Borst Jr., Richard P. Campbell, McConnell, Curtis, Mahon & Borst, Chicago, Ill., for appellant.

Tom L. Yates, Anthony R. Basile, Oak Park, Ill., for Hartzog-Schneck Aviation, Inc.

Luther C. McKinney, Chicago, Ill., Henry P. Sailer, Washington, D. C., William Porter, Wichita, Kan., for Beech Aircraft.

Before KILEY, FAIRCHILD and PELL, Circuit Judges.

PELL, Circuit Judge.

Fontana, appellant herein, is a Michigan corporation operating at an airport in Iron Mountain, Michigan, and engaged in the business of selling and servicing airplanes, as well as providing various flight connected services. Appellee, Beech, is a Delaware corporation with its principal place of business in Kansas. It is engaged in the manufacture, distribution and sale of aircraft under the trade name "Beechcraft." Beech sells its planes through a nationwide network of twenty-four distribu-

tors who in turn sell largely to retail dealers although Beech at all material times involved owned and operated some distributor companies, which not only sold to independent dealers but also to the ultimate consumers.

The appellee, Hartzog, is an Illinois corporation located in Rockford, Illinois. It has been a Beechcraft distributor since 1961 and its territory included not only portions of Illinois but of several adjoining states including the upper peninsula of Michigan, in which Fontana was located. While Hartzog sold to independent dealers, it also sold directly to consumers through its wholly owned dealer company.

Fontana had been a Beechcraft dealer since 1946. Following Hartzog's becoming a Beechcraft distributor in 1961, Fontana purchased airplanes sold by it from Hartzog until the termination of the dealership by Hartzog in April 1966.

Subsequent to the termination, Fontana filed an antitrust action against Beech and Hartzog alleging a conspiracy whereby the United States was divided into exclusive territories with each distributor having a separate territory and with distributors being restricted from competing in each other's territory; prices were fixed on the resale of new Beech aircraft; illegal demonstrator and stocking requirements were imposed on independent dealers and restriction was made on the sale of a new model aircraft known as the King Air Model to distributor organizations or their wholly owned dealer companies. Fontana claimed that its dealer contract was cancelled by Hartzog pursuant to the alleged conspiracy when Fontana refused to acquiesce in territorial, stocking and airplane model restrictions and that Fontana, subsequently, was unable to secure a dealership from other distributors.

While there was some dispute between the parties on this appeal as to various evidentiary matters, there was testimony adduced in the district court to support a jury finding that the factual situation is the following.

Prior to 1966, Beech's contracts with its distributors, and the contract that Beech distributors had with their dealers, contained limitations upon the sale of airplanes outside the distributors' or dealers' "territory." There were provisions for interterritorial financial adjustments if such sales outside the territory took place. Further, these territorial limitations had been the subject of discussion between Beech and its distributors. These discussions ordinarily occurred at meetings of the Beech distributor advisory council which met and discussed mutual problems. The council included the president of Hartzog and the meetings were attended by officials of Beech. In February 1964, the minutes of the council indicated that there had been concern expressed at legal ramifications of the portion of the contract dealing with the territorial restrictions.

During the period of 1961 to 1966, Fontana had made one payment of $1000 to a distributor for an out-of-territory sale and had received through Hartzog one-half, or $5000, of the amount paid by another distributor for a sale within the Hartzog-Fontana territory.

In 1966, Beech's standard distributor contract was amended. The provision pertaining to financial adjustments following out-of-territory sales was eliminated. There was a provision that the distributor agreed to appoint and establish "in its area of responsibility" the minimum number of authorized Beechcraft dealers required to secure adequate market penetration. It appears that under the 1966 agreements a distributor could not appoint a dealer in another distributor's area of responsibility. Early in 1966, when the corporate class plane market was just beginning to develop, representatives of Fontana and Hartzog met, at which time Fontana indicated it wanted a dealer contract which would permit it to sell the relatively new King Air without being required to purchase and stock the entire line of Beech planes necessary to obtain a twenty percent discount. Hartzog replied that Fontana should confine its

sales efforts to single engine and light twin planes only and that it would not receive a contract permitting it to sell King Air. Fontana indicated it would attempt to secure a direct dealership from Beech. Hartzog replied that if it did so Hartzog would cancel Fontana's contract. Subsequently, Fontana unsuccessfully attempted to secure a direct dealership from Beech, which declined to deviate from its established marketing setup through distributors. Thereafter, Hartzog terminated the Fontana dealership contract as of April 15, 1966. Subsequently, Fontana sought to secure an authorized dealership from two other distributors, one located in Pontiac, Michigan, and one located in Rochester, Minnesota. These distributors, after checking with Beech, declined to enter into a dealership contract with Fontana.

Fontana claimed that after cancellation it had seventeen excellent prospects for purchase of Beech aircraft. During the trial of the cause below, Fontana, after objections by the defendants, was limited in its damage estimate, insofar as post cancellation damages were concerned, to the seventeen named prospects.

In addition to the post-cancellation damages, Fontana claimed damages resulting from three precancellation situations. One was that it received only a ten percent dealer discount on sales of Baron and Travel Air Plane sales instead of the twenty percent discount because of its not stocking certain Beech aircraft required by the dealer contract. Secondly, Fontana contended it was improperly confined to a sales agent commission of $12,500 on a King Air sale originated by it instead of the twenty percent discount it would have received in the absence of the restrictions contained in the Hartzog contract. Thirdly, Fontana contended it was entitled to reimbursement of a $1,000 penalty paid by it to a Kentucky distributor for an out-of-territory sale.

As may be needed in the development of this opinion, further specific reference to the factual situation appearing in the evidence will be brought out in connection with the examination of the applicable law.

Following a five week jury trial, a verdict was returned in favor of Fontana in the amount of $150,000, on which the court entered judgment in the trebled amount of $450,000, together with costs and attorneys' fees. Thereafter, pursuant to defendants' motion, the district court vacated the treble-damage judgment and entered judgment for the defendants notwithstanding the verdict. The court in addition conditionally granted a new trial "should this judgment be vacated or reversed." Fontana instituted the present appeal from the court's action.

During the course of the proceedings, Hartzog had filed a counterclaim for $5,000 because of the $5,000 territorial infringement payment made to Fontana during the course of its dealership. The jury awarded Hartzog $5,000 on the counterclaim. The district court also entered judgment, notwithstanding the verdict, on the counterclaim and dismissed the counterclaim on the merits. Hartzog likewise filed an appeal.

The district court judge in an apparent partial reliance on the then recently decided case of United States v. Container Corporation of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 52 (1969), stated in his memorandum opinion, "[W]e will assume, but not decide, that defendants are guilty of antitrust violations." The district court in part also apparently rested its decision on its ultimate determination that there was no fact of damage shown by Fontana, thereby enabling the court to dispose of the motion for judgment notwithstanding the verdict without regard to a determination of the antitrust issue. The granting of the new trial conditionally was predicated on the same grounds supporting the granting of the motion for judgment n.o.v., presumably that there was no fact of damage. There is no indication in the court's memorandum opinion or order that the new trial was

conditionally granted because of a failure to prove an antitrust case.

The result which we will reach in this opinion is that the judgment notwithstanding the verdict was erroneous. However, we will also, as we may do, review the conditional order of the trial court, made pursuant to Rule 50(b), F.R.Civ.P., granting a new trial. 3 Barron & Holtzoff-Wright, Federal Practice and Procedure § 1302.1, p. 346 (1958).

Inasmuch as the district court did not reach a final decision on whether a judgment notwithstanding the verdict should have been granted insofar as antitrust issues were concerned, and inasmuch as further proceedings in the court below following the remand may involve consideration of whether to grant a motion for a judgment notwithstanding the verdict, on the antitrust issue, we deem it necessary to turn to that issue as a threshold question.

■ In so doing, we are not deciding whether the weight of the evidence does or does not support an antitrust violation. We are not weighing the evidence but only inquiring as to whether there is any substantial evidence which would support a verdict, for if there was then a motion for judgment notwithstanding the verdict insofar as the antitrust issue was concerned should have been overruled. 2B Barron & Holtzoff-Wright, Federal Practice & Procedure § 1075, pp. 384–85 (1961).

■ There was evidence at the trial below supportive of a conspiracy in violation of the Sherman Act. Tests for determination of such a violation were laid down in American Tobacco Co. v. United States, 328 U.S. 781 (1946), in which the court stated the following (at 809–810, 66 S.Ct. 1125, 90 L.Ed. 1575):

"It is not the form of the combination of the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. * * * No formal agreement is necessary to constitute an unlawful conspiracy. * * * The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words. * * * Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified."

There was evidence in the case before us on which the jury reasonably could have found that for the purpose of lessening competition a rigid territorial division had been worked out on a horizontal basis between the various distributors with the tacit approval of Beech, which also participated therein through its own distributor companies.

There was evidence from which the jury could have found that this arrangement continued up to the 1966 standard agreement coming into effect. If Beech, in good faith, had eliminated unlawful antitrust aspects of its marketing arrangements by the 1966 contract then, of course, the conspiracy violative of the Sherman Act would have also ceased and the company should not be penalized for its efforts to set its house in order. On the other hand window dressings and changes of words in contracts are not controlling. The matter is one of substance and not form.

Agreements or arrangements providing for an aggregation of trade restraints are violative of the act; nor can the restraints of trade be justified as reasonable steps taken to implement a valid trademark licensing system. Timken Roller Bearing Co. v. United States, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

The defendants contend that a manufacturer is free to agree with his vendee in a particular geographic area that he will sell to no others in that area. The Supreme Court, although not deciding the difference in impact, did in White

Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), recognize a possible distinction between territorial restrictions arising out of a vertical arrangement as opposed to one of a horizontal nature. Nevertheless, Mr. Justice Brennan in concurring stated at p. 267, 83 S.Ct. at p. 704:

"If it were clear that the territorial restrictions involved in this case had been induced solely or even primarily by appellants's dealers and distributors, it would make no difference to their legality that the restrictions were formally imposed by the manufacturer rather than through inter-dealer agreement."

While the case before us would scarcely seem to be that of the tail wagging the dog, such as apparently was involved in United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967), there was sufficient evidence for the jury's consideration of concerted horizontal action, participated in by Beech.

United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L. Ed.2d 1249 (1967), held that territorial limitations on resales by distributors, where the distributors own the goods, were violative of the antitrust laws. In the case before us, the comparable situation existed in which the practical effect was that only one distributor could enter into an authorized dealership arrangement with Fontana.

While the law recognizes that a manufacturer, in the battle for business, has a right to sell to whom he pleases, this right is neither absolute nor exempt from regulation. If it is accompanied by unlawful conduct or agreement, or conceived in monopolistic purpose or market control, the right is deemed to have transgressed the act. A. C. Becken Co. v. Gemex Corp., 272 F.2d 1 (7th Cir.1959).

While we have here primarily concerned ourselves with the restraint on out-of-territory dealer appointments, we find adequate supportive evidence in the overall pattern of operation on which to base a verdict with regard to the other matters of complaint by Fontana, being the stocking requirement and the restraint on sale of King Airs. All of these matters could well have been found by the jury as having been conceived as a part of an illegal market control.

■ Upon the basis of the foregoing, we hold therefore that the district court should not have granted a judgment notwithstanding the verdict on the antitrust issue. However, unlike the motion for judgment n.o.v., the matter of granting a new trial is to be determined in the sound discretion of the trial court. 6A Moore, Federal Practice ¶ 59.08 [5], p. 3816 (1966). Deference must be given to decisions of the trier of the fact who is usually in a superior position to appraise and weigh the evidence, Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L. Ed.2d 129 (1969), which is a deference which should also be accorded to the trial judge in a jury case, he having heard and lived with the evidence during a lengthy trial. On remand, the district court should determine prior to a new trial whether the antitrust issue should again be presented to the jury or whether a new trial should be confined to the issue of damages.

■ As previously indicated herein, the district judge in granting judgment n.o.v. did so on the basis of lack of proof of the fact of damage. The damage question in private antitrust suits is composed of two components: the fact of damage—injury to plaintiff's business resulting from the alleged illegal conspiracy—and the amount of damages. Once the fact is established, uncertainty concerning the exact amount of loss will not preclude recovery.

"The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount." Story Parch-

ment Co. v. Paterson Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).

In Zenith Radio Corp. v. Hazeltine Research, Inc., supra, 395 U.S. at p. 114, n. 9, 89 S.Ct. at p. 1571, the Supreme Court characterized plaintiff's burden on the critical fact of damage issue as follows:

"Zenith's burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage. It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4."

As the Supreme Court further pointed out in *Zenith* (395 U.S. at p. 123, 89 S. Ct. at p. 1576) "damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts."

■■■ The basis of the trial court's order granting the judgment n.o.v. was its conclusion that the evidence was overwhelmingly and conclusively against the jury's determination that plaintiff had shown the fact of damage. Our examination of the record convinces us the trial court erred in this conclusion. Fontana's major claim of damage was the alleged loss of sales to certain identified prospects due to the cancellation of its status as a Beech authorized dealer.

Fontana contended that there was supportive evidence that all of the prospects already owned planes and that they had business needs for executive aircrafts as well as having some business connection in the Iron Mountain, Michigan region.

Fontana had previously sold planes to and done service work for some of the prospects and a number of the prospects subsequently did purchase aircraft.

Fontana's evidence upon damages was based almost solely upon opinion testimony of its 26 year old Board Chairman. The testimony was such that if we were weighing the evidence we would find this rather weak, but as we have already stated we are not here weighing the evidence. The fact is that, over objection, the officer of Fontana was permitted to testify and to give his opinion regarding the loss of sales to the seventeen prospects. There is no indication in the record that the court struck the testimony as being speculative or conjectural or that the entry of the judgment n.o.v. was based upon this premise. The trial judge's memorandum opinion specifically stated that it was without regard to issues of credibility.

While proof of loss by the particular method adopted by Fontana does not meet the ordinary standards, *see* Flintkote Company v. Lysfjord, 246 F.2d 368, 392 (9th Cir.), cert. den. 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957), the circumstances of plaintiff's business and the developing corporate airplane market did not present the usual situation. Actually, the testimony showed that plaintiff's business prior to the termination of the Beechcraft contract had been operating at a deficit. Apparently in this respect Fontana would have been limited to showing that the deficit was even greater after the loss of the Beechcraft dealership. Nevertheless, the evidence was in, and remained in, and while its weight may be extremely questionable, we cannot say now that, for the purpose of considering the correctness of the ruling on the judgment notwithstanding the verdict, it should have been disregarded.

On the retrial of this cause the court may well desire to determine the admissibility of this type of evidence.

Over and above this aspect of the matter, we are in a day and age in which the value of the nationally advertised franchise is a matter of general recognition. If Fontana were deprived of the dealership (or franchise right) as a result of an illegal conspiracy, some damage would appear to be implicit. Beech's Vice President conceded that

Fontana would be at a competitive disadvantage in attempting to sell new Beech airplanes after the loss of its authorized dealer status.

Insofar as the ruling on the judgment n.o.v. was concerned, the fact that the alleged illegality put plaintiff at a competitive disadvantage in competing for the business of a number of identified prospects was adequate to make erroneous the ruling on the motion for judgment n.o.v. If there were other possible causes of plaintiff's inability to sell new Beech airplanes to the apparently sound prospects, it would appear that the defendants were under obligation to go forward with evidence to that effect and Fontana "was not required in the first instance to prove the absence of all other conceivable causes." American Cooperative Serum Ass'n v. Anchor Serum Co., 153 F.2d 907, 912 (7th Cir.1946).

As to the contention by Hartzog and Beech that plaintiff could have obtained new Beech aircraft from Beech distributors even without an authorized dealer status, problems existed. Beech's Vice President tacitly admitted that this theoretical possibility was not a practical solution when he testified to the many technical services that are available only to authorized Beech dealers and conceded that an unauthorized dealer would be at a competitive disadvantage.

Further there was evidence that the plaintiff did attempt to compete in this manner on at least two separate occasions but unsuccessfully so. Fontana was not bound to make repeated requests for airplanes from Beech distributors or to exhaust every possible avenue to avoid the effects of defendant's alleged illegal activity but could maintain an action for an injury which flows naturally and expectedly from such activity. *Zenith, supra,* 395 U.S. at p. 114 n. 9, 89 S.Ct. 1562; Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696–702, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

In the district court's memorandum opinion it was stated that about half the prospects came to plaintiff only after the filing of this action and damages related to them were not recoverable. The determination of the trial court in this respect is erroneous even on the amount of damage issue. It is clear that some post-filing damages may be recovered in antitrust suits. Where the alleged damages are the result of acts occurring prior to the filing of the complaint, there can be no doubt that they may be recovered even though they may have accrued following such filing. Lawlor v. Loewe, 235 U.S. 522, 536, 35 S.Ct. 170, 59 L.Ed. 341 (1915) and Becken Co. v. Gemex·Corp., 314 F.2d 839, 842–843 (7 Cir.1963). In the instant case the alleged damages resulted from plaintiff's inability to compete. The cause of that inability to compete was the single act of defendants, occurring before the filing of the complaint, in depriving plaintiff of his authorized dealer status.

The trial court's decision and defendants' argument also rely heavily on the fact that plaintiff did not call any of the prospects to testify. Indeed, one prospect was called by the defendants and negatived the testimony of Fontana's Board Chairman. This undoubtedly weakened plaintiff's case and the jury may well not have accepted the Fontana witness' assertion as to some of the alleged prospects and· may have reduced the damage award accordingly. Apparently this is what happened, for the jury award is substantially less than the amount plaintiff asserted as its damages.

What we have said is sufficient to indicate the error of the trial court in finding that the evidence on the fact of damage issue was overwhelmingly and conclusively against Fontana. Once there is sufficient evidence of the fact of damage to go to the jury, the assessment of the amount is largely a matter of the jury's consideration of all the evidence. Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

In its memorandum opinion the district court dealt in *seriatim* fashion with each of plaintiff's alleged items of

damage and concluded that the evidence supported none of them. Of this approach, the Supreme Court has said:

"We think this was improper. In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. '* * * [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. United States v. Patten, 226 U.S. 525, 544, 33 S.Ct. 141, 57 L.Ed. 333 * * *; and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it.' American Tobacco Co. v. United States, 147 F.2d 93, 106 (C.A.6th Cir.). See Montague & Co. v. Lowry, 193 U.S. 38, 45–46, 24 S.Ct. 307, 309, 48 L.Ed. 608." Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 698–699, 82 S.Ct. 1404, 1410 (1962).

We need not stop to deal with each of the damage claims and the court's treatment of them. In each case, the court apparently felt that plaintiff had introduced competent evidence in support of the claim but found that other evidence defeated the claim. Since the court in its discretion was satisfied in the event the judgment notwithstanding the verdict was not upheld that an adequate basis for a new trial existed, at least on the question of damages, we will not disturb that exercise of his discretion. The evidence under proper rules of admissibility will go to the jury and the jury will be in a position to exercise its prerogative to weigh the evidence in fixing the amount of plaintiff's damages.

We affirm the action of the trial court in granting judgment notwithstanding the verdict insofar as the $5,-000 judgment on the counterclaim of Hartzog is concerned. If there was any injury resulting from a violation of the Sherman Act involved in the particular transaction, it was another distributor which suffered the injury, not Hartzog.

For the reasons herein set forth, judgment of the trial court in granting a judgment notwithstanding the verdict is reversed and this cause is remanded to the district court for further proceedings not inconsistent herewith.

Reversed.