**HOBART BROTHERS COMPANY,**
Plaintiff-Appellant,

v.

**MALCOLM T. GILLILAND, INC.,**
Defendant-Appellee.

No. 72–1064.

United States Court of Appeals,
Fifth Circuit.

Jan. 9, 1973.

Rehearing Denied Feb. 26, 1973.

John M. Sikes, Jr., Joseph Lefkoff, Atlanta, Ga., Francis D. Morrissey, Chicago, Ill., Lawrence W. Newman, Baker & McKenzie, New York City, for plaintiff-appellant.

Hamilton Lokey, Atlanta, Ga., Wright Gellerstedt, Decatur, Ga., for defendant-appellee.

Before COLEMAN, GOLDBERG and GODBOLD, Circuit Judges.

COLEMAN, Circuit Judge:

Hobart Brothers Company sued Malcolm Gilliland, Inc. for monies owed on open account in the sum of $21,184.44.

Gilliland admitted the alleged indebtedness, but filed a three-count counterclaim. The counterclaim alleged a breach of the distributorship agreement, the failure of Hobart to credit a return of defective goods, and the negligence of Hobart in filling a particular order.

Nine months after filing its original answer, Gilliland amended by adding anti-trust counterclaims that (1) enforcement of an illegal contract placed geographical restrictions on Hobart's distributors in violation of § 1 of the Sherman Act; (2) cancellation of Gilliland's distributorship because of Gilliland's breach of Hobart's territorial sales restrictions was in violation of § 1 of the Sherman Act; and (3) cancellation of Gilliland's distributorship becaues of Gilliland's breach of Hobart's resale price restrictions was in violation of § 1 of the Sherman Act.

Hobart was granted summary judgment on its original complaint.

The issues raised in this appeal involve Gilliland's anti-trust claims.

We affirm the judgment of the District Court.

### The Facts

Hobart Brothers Company, located in Troy, Ohio, is a manufacturer of welding equipment and consumable welding supplies.

In February, 1960, Malcolm Gilliland signed a distribution agreement with Hobart whereby Gilliland became a distributor of Hobart equipment for Northern Georgia. Under this distribution agreement Gilliland was limited territorially as to where he could sell. The agreement stated:

"Territorial arrangements are covered by correspondence, approval of which is indicated by the distributor's

acceptance of this General Policy Outline. The extent to which a distributor may be protected in a territory is established by correspondence . . .

"The Distributor shall not solicit orders outside his assigned territory."

In June, 1964, a new distribution agreement was substituted. It did not contain outright territorial restrictions but instead only gave the distributor primary responsibility for certain territories. The policy stated:

"All territories have previously been assigned to distributors, and those which Hobart shall assign hereafter, the geographical areas in which distributorships shall be primary responsible for the sale and distribution of Hobart products [sic] . . . Hobart shall refer inquiries from these areas to the appointed distributor, so long as the distributor adequately represents Hobart in the area designated as his primary responsibility and promotes the sale of all Hobart's products.

"Hobart cannot assume responsibility for sales made by independent distributors outside their assigned territories."

Gilliland bore a dual relationship to Hobart. First, Gilliland was a distributor of Hobart's products, and, second, Gilliland competed with Hobart in the manufacture and sale of continuous wire feeder mechanisms. Gilliland used a Hobart power source in his wire feeder. This dual relationship existed from the time Gilliland accepted the distributorship. Hobart knew from the beginning that Gilliland was constructing equipment that competed with Hobart's. Hobart, according to the testimony, was never concerned with this minor competition as long as Gilliland's actions were compatible with the sale of Hobart products. Moreover, Hobart sold its products directly from the home office in competition with its own distributors.

In April, 1964, Hobart became alarmed when Gilliland began selling products in Tennessee that competed directly with Hobart. Tennessee was outside Gilliland's assigned territory. Hobart received similar reports of Gilliland competing directly with Hobart in May and September, 1964. Hobart's Tennessee district representative in an intra-office memo suggested that Hobart "counter" by selling directly in Gilliland's territory. On May 11, 1964, Hobart became aware that Gilliland was making disparaging remarks to some of Hobart's direct customers and at the same time was promoting his own products.

In September, 1964, Hobart was notified that the General Electric plant in Rome, Georgia, (which was in Gilliland's territory) was having trouble with Hobart products that Gilliland supplied. A Hobart sales representative, Wendell Jones, went to this General Electric plant on September 23, 1964, at General Electric's request, to examine the Hobart products. Jones discovered in General Electric's stock that electrodes of other manufacturers were mixed with Hobart electrodes in Hobart boxes and that some Hobart flux was mislabeled. Jones told the management of General Electric of these facts. General Electric at this meeting asked Jones if Hobart would be interested in handling the General Electric account directly. Hobart began doing so.

Jones took samples of the electrodes to have them tested by a Hobart chemist. The chemist's report showed that sample batches of electrodes reported as "bad" by General Electric welders were good workable electrodes. A second sample of electrodes was taken by Hobart, but no Hobart official could recollect the outcome of this second test. Until pre-trial discovery Gilliland was never aware of the Hobart reports or of the meeting at General Electric relating to Gilliland's handling of the General Electric account.

Gilliland claims that Hobart twice disparaged Gilliland on another occasion. These two disparagements occurred at a meeting on October 28, 1964, at the General Electric plant at Rome, Georgia. A

Hobart representative, W. R. Stevens, told the management of General Electric that Gilliland was supplying General Electric with Hobart 24A type electrodes contrary to the purchase orders which specified type 24 electrodes. Gilliland offered proof which showed that Hobart had recommended and developed the 24A type electrode at General Electric's request after General Electric had encountered problems with the 24 type electrode. According to his testimony W. R. Stevens was not aware of General Electric's request to Hobart. Stevens also told the management of General Electric that Gilliland was not supplying General Electric with the high grade MIG 18 welding wire which General Electric had ordered. Stevens told General Electric that Gilliland was substituting a less expensive grade MIG 25 type wire. A General Electric employee, Ben James, testified that he had ordered the change in wire type, but that he had not put through the necessary paper work to show that the change had been made.

Gilliland's sales to General Electric amounted to $63,410.97 in 1963. Gilliland's sales to General Electric in 1964, up to the time that General Electric cancelled its account, amounted to $36,843.-81.

In September, 1966, Hobart cancelled its distributorship agreement with Gilliland.

Gilliland claims it was damaged on another occasion when the American Buildings Company of Eufaula, Alabama, in 1964, cancelled an order for a continuous wire feeder. Gilliland was told that the order was cancelled because Hobart told American Buildings Company that Gilliland had caused trouble at the General Electric plant at Rome, Georgia, by supplying defective materials.

Gilliland claims that the loss of the General Electric account was due to Hobart's trade disparagement. Gilliland further contends that Hobart's actions were in retaliation for Gilliland's breach of the territorial restrictions and for Gilliland's competition with Hobart in the sale of wire feeders, which both manufactured.

Gilliland alleges that it was damaged as follows: (1) as a result of Hobart's cancellation of Gilliland's distributorship Gilliland lost $25,000 in profits on resale of Hobart's products; (2) as a result of the loss of the General Electric account Gilliland was damaged in the sum of $255,000; and (3) as a result of a refusal of American Buildings Company to deal, Gilliland was damaged in the amount of $50,000.

The District Court submitted the issues by special interrogatories. The jury answered the following five interrogatories affirmatively:

"(1) Did Hobart in the period from and after January 29, 1964, take action or actions in violation of the anti-trust laws which were a material factor in damaging Gilliland's subsequent profits earned or sales?

"(2) Underlying such action or actions taken by Hobart Brothers Company to damage Malcolm T. Gilliland, Inc., was there an intent on the part of Hobart to restrain Gilliland in its competitive interstate sales activity carried on outside of the territorial boundaries assigned to Hobart?

"(3) Were such action or actions taken by Hobart the proximate cause of such damage or injury claimed by Malcolm T. Gilliland, Inc.?

"(4) Has Malcolm T. Gilliland, Inc., been injured in its business by reason of a loss of business?

"(5) If Malcolm T. Gilliland, Inc., was injured by reason of loss of business, which injury was proximately caused by an agreement to which Hobart Brothers Company was a party entered into existing on or after January 29, 1964, which had as its purpose the unreasonable restraint of trade, what was the loss of prof-

its sustained by Malcolm T. Gilliland, Inc. on sales from January 29, 1964, to the present time?"

In answer to the last interrogatory the jury awarded Gilliland $67,000 in damages. This judgment was tripled as allowed under 15 U.S.C. § 15. In addition, Gilliland's attorneys were awarded $75,000 in attorneys' fees. Gilliland was thus awarded a total judgment of $276,000.

Hobart's motions for judgment N.O.V. and for a new trial were denied by the District Court.

Hobart alleges that the District Court committed the following errors: (1) Gilliland failed to prove a contract, combination, or conspiracy in restraint of trade in violation of § 1 of the Sherman Act; (2) Gilliland failed to prove a causal relationship between the concerted action (contract, combination, or conspiracy) in restraint of trade and any injury to Gilliland; (3) Gilliland failed to prove damages; (4) the admission of testimony of Gilliland's expert witness, Dr. Dietz, was prejudicial because it was based on assumptions for which there were no foundation in the evidence; and (5) the charge to the jury was clearly erroneous.

### The Law

A. The Finding of a Contract in Restraint of Trade

Section 1 of the Sherman Act provides that:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

■ It is a per se violation of § 1 for competitors at the same level of the market structure to allocate territories in order to minimize competition. See United States v. Topco Associates, Inc.,[1]

405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), and cases cited therein.

■ By use of its distribution agreement signed in June, 1964, Hobart limited Gilliland to the area in which Gilliland could sell Hobart products. While Gilliland could sell Hobart products, it also competed directly with Hobart in products they both manufactured and in accounts that Hobart serviced directly from its home office. Hobart had similar distribution agreements with other distributors. The effect of such agreements was to eliminate competition between Hobart and its distributors. See Interphoto Corporation v. Minolta Corporation, 295 F.Supp. 711 (S.D.N.Y., 1969), affirmed, 2 Cir., 1969, 417 F.2d 621. The Hobart distribution agreement, while appearing to allocate territory vertically, in fact, resulted in a horizontal territorial allocation between Hobart and its own distributors. Such an arrangement must be treated as it operated in practice rather than "as arranged by skillful drafting". Cf. Simpson v. Union Oil Company of California, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964).

■ Hobart argues vigorously that this distribution agreement, signed in 1964, containing a primary responsibility clause, is not a contractual restraint in violation of § 1 of the Sherman Act. Hobart asserts that a contract explicitly restricting Gilliland to sell in certain areas must be shown. Furthermore, Hobart argues that there could be no contract preventing Gilliland from selling in any area, since Gilliland sold Hobart products outside the assigned territory. Hobart contends that the only way Gilliland can prove the existence of a contract is for Gilliland to show that by not selling outside the assigned territory he thereby gave its assent to the terms of the Hobart distribution agreement.

1. It was made very clear in the *Topco* decision that a horizontal allocation of markets absent price fixing is a *per se* violation, United States v. Topco, *supra*, at 92 S.Ct. 1134, n. 9.

For three reasons Hobart's views as to whether an illegal agreement exists are erroneous.

■ First, a primary responsibility clause[2] in a distribution agreement, when the manufacturer has parted with title, dominion, and risk over the product, can be enlarged by a silent understanding to restrain trade in violation of § 1 of the Sherman Act,[3] United States v. Arnold, Schwinn and Company, 388 U.S. 365, 382, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). A silent understanding can be shown by the course of conduct of the parties, United States v. Schrader's Son, Inc., 252 U.S. 85, 99, 100, 40 S.Ct. 251, 253, 64 L.Ed. 471 (1920). Hobart's intra-office correspondence, which was introduced into evidence, shows clearly that Hobart considered the distribution agreement containing the primary responsibility clause to have the same effect as the prior distribution agreement which contained outright territorial restrictions.[4]

Second, in United States v. Parke, Davis and Company, 362 U.S. 29, 80 S. Ct. 503, 4 L.Ed.2d 505 (1960), a case involving a manufacturer's refusal to deal with his distributors, the Supreme Court held that the "essential agreement, combination, or conspiracy" necessary for a violation of §§ 1 or 3 "might be implied from a course of dealing". Furthermore, the Court in United States v. Parke, Davis, supra, in discussing Federal Trade Commission v. Beach-Nut Packing Company, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882 (1922) said that the Court there held that the

"nonexistence of contracts . . . was irrelevant" since competition could be suppressed by methods that are as effectual as express or implied agreements. In Osborn v. Sinclair Refining Company, 4 Cir., 1963, 324 F.2d 566, the Court in discussing United States v. Parke, Davis, supra, said:

"If the arrangement or combination . . . is put together through the coercive tactics of the seller alone, this is sufficient." Osborn v. Sinclair Refining Company, supra, at 573, 574 n. 13.

■ Therefore, if an agreement can be implied in cases involving a refusal to deal, there is no reason an agreement cannot be implied in cases involving a horizontal market division.

■ Hobart could refuse to deal with Gilliland, but that right did not give Hobart immunity so that it could use an illegal territorial restraint, Simpson v. Union Oil Company, supra, 377 U.S. at 17, 84 S.Ct. 1051. See, also United States v. Parke, Davis, supra, 362 U.S. at 43, 80 S.Ct. 503. The Court in Fontana Aviation, Inc. v. Beech Aircraft Corporation, 7 Cir., 1970, 432 F.2d 1080, cert. denied 401 U.S. 923, 91 S.Ct. 872, 27 L.Ed.2d 826, said that if this right is accompanied by an unlawful agreement or "conceived in market control", then the right "transgresses" the anti-trust laws, Id. 432 F.2d at 1085.

■ Third, to show an illegal contract in restraint of trade Gilliland is not required to abide by the terms of that illegal contract. It cannot success-

---

2. In Zimmerman, Distribution Restrictions After Sealy and Schwinn, 12 Anti-trust Bulletin, 1181, 1187–89, the author states:

[W]hile the [Schwinn] Court was addressing itself to restrictions which precluded resale to purchasers located in another territory or to certain classes of purchasers, it would be a dangerously niggling reading of the opinion to ignore its implications for other contractual restrictions. Hence, contractual terms such as areas of primary responsibility clauses . . . will suffer the fate of the Schwinn restrictions if in operation they

effectively serve to bar inter-territorial sales or to prevent sales to specified classes of customers.

3. While the Hobart distribution agreement operated horizontally, we treat its vertical aspect for the purpose of discussing the effect of a primary responsibility clause.

4. Hobart in 1964 revised its distribution agreement it had with its distributor. The original distribution agreement like the one signed by Gilliland in 1960 would have been illegal under the Schwinn rationale.

fully be argued that Gilliland must continue to subject itself to anti-trust violations prior to bringing suit so that it can obtain relief when it comes into court. The Supreme Court in Simpson v. Union Oil Company, *supra,* held in a similar vein that a dealer whose consignment agreement was cancelled for failure to adhere to a fixed resale price could bring suit under the anti-trust laws even though by signing the agreement he had, to that extent, become a participant in an illegal scheme.[5]

## B. The Causal Relationship

■ Under § 4 of the Clayton Act, 15 U.S.C. § 15, a party claiming damages must show that he has been "injured in his business or property by reason of anything forbidden in the antitrust laws". Therefore, Gilliland can succeed in its anti-trust claims only if it is able to show that its injury was caused by conduct prohibited by the anti-trust laws, Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc., 9 Cir., 1965, 346 F.2d 1012, 1014, cert. denied 382 U. S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362; E. V. Prentice Machine Company v. Associated Plywood Mills, 9 Cir., 1958, 252 F.2d 473, 477, cert. denied 356 U.S. 951, 78 S.Ct. 917, 2 L.Ed.2d 844; Flintkote Company v. Lysfjord, 9 Cir., 1957, 246 F.2d 368, 392, cert. denied 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46; and Ford Motor Company v. Webster's Auto Sales, Inc., 1 Cir., 1966, 361 F.2d 874, 883.

■ Gilliland alleged it was damaged in three ways: (1) the loss of its Hobart distributorship; (2) the loss of the General Electric account; and (3) the loss of the initial sale to American Buildings Company. Hobart's anti-trust violation was the imposition of illegal territorial restrictions. Hobart penalized Gilliland for violating the territorial restraints by disparaging Gilliland's performance to General Electric and American Buildings Company and by terminating Gilliland's distributorship.

Clearly, a territorial restraint is not effective unless in some way its violation can be deterred. Hobart initially tried to "persuade" Gilliland to abide by the territorial limits by causing Gilliland to lose several customers. Hobart did not want to cancel the Gilliland distributorship when Gilliland was still selling a substantial volume of Hobart products.

Finally, Hobart imposed the ultimate sanction by terminating Gilliland's distributorship. Hobart's initial disparagement of Gilliland to General Electric must be viewed as part of Hobart's intent to enforce its territorial restrictions, Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc., 5 Cir., 1966, 365 F.2d 478, 485, 486, and Osborn v. Sinclair Refining Company, 4 Cir., 1960, 286 F.2d 832, 837, cert. denied 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255. From the surrounding circumstantial evidence, the triers of fact were entitled to infer the necessary causal relationship between Hobart's disparagement as used to enforce the illegal territorial restraints and Gilliland's damages. See Zenith v. Hazeltine, 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

## C. The Fact of Damages

Hobart claims even if the jury found that "Hobart employees made disparaging comments about Gilliland, the record is devoid of any evidence that General Electric was in any way influenced by such remarks". Hobart claims this lack of effect is shown by the fact that Gilliland sold a welding machine to General Electric for testing and evaluation in 1966 and another machine for the same purpose in 1967.

The evidence refuted these contentions.

First, there was a Hobart intra-office report of October 4, 1964, showing that Hobart believed that the tests run to verify the authenticity of the Gilliland-General Electric electrodes would determine whether *General Electric* would

5. See also Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

"continue to do business with Malcolm Gilliland" or would cause a request for quotations direct from Hobart rather than from Gilliland.

Second, a Hobart intra-office report of October 28, 1964, stated that at a meeting Hobart had with General Electric there was an expression of view by General Electric that "under no circumstances would Malcolm T. Gilliland ever be allowed out in the plant of General Electric again". Certainly, these two reports support the claim that Gilliland was affected by Hobart's disparagement.

 The fact that Hobart can point to isolated sales by Gilliland to General Electric does not effectively negate the total damage that Gilliland suffered. The jury has the function of weighing this type of evidence. An appellate court should not substitute its own judgment unless there is a complete absence of substantial probative facts to support the jury's verdict, Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946).

Hobart also claims that "Gilliland lost no sales of welding equipment prior to August of 1966". Hobart's basis for this contention is the testimony of Ben James, the General Electric engineer responsible for purchasing welding machines. Gilliland introduced evidence sufficient to support a jury belief that the Hobart representative, Wendell Jones, acted in concert with Bill Taylor, another General Electric engineer, to undercut the position of Ben James. Therefore, the jury could believe that Ben James did not know the true state of affairs at the General Electric plant.

### D. Admission of the Testimony of Gilliland's Expert Witness

 Once causation in an anti-trust action has been established, the jury is permitted to make " a just and reasonable estimate of the damage based on relevant data", Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). In an anti-trust case the burden on the plaintiff to prove the amount of damages is less severe than the burden to prove the fact of injury, Flintkote Company v. Lysfjord, supra, 246 F.2d at 392. The Supreme Court in Zenith v. Hazeltine, supra, said as to this burden of proof that there are:

> ". . . practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market [since] damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." Id. 395 U.S. at 123, 89 S.Ct. at 1576.

 Therefore, the amount of damages need not depend on precise proof, Locklin v. Day-Glo Color Corporation, 7 Cir., 1970, 429 F.2d 873, 879, cert. denied 400 U.S. 1020, 91 S.Ct. 584, 27 L. Ed.2d 632, but can be based on assumptions if the assumptions rest on an adequate base, Herman Schwabe, Inc. v. United States Shoe Machinery Corporation, 2 Cir., 1962, 297 F.2d 906, cert. denied 369 U.S. 865, 82 S.Ct. 1031, 8 L. Ed.2d 85.

Hobart complains that Dr. Dietz, an economist, who testified as an expert witness for Gilliland, made erroneous assumptions in calculating the monetary damages Gilliland suffered. Dr. Dietz's calculations of the damages were based on two different methods. The results of the two methods were very close. According to Dr. Dietz's more precise method Gilliland's damages from 1964 to 1970 were approximately $174,000. The assumptions of Dr. Dietz to which Hobart objects are that (1) he assumed that the damages began from January 1, 1964, instead of from September 23, 1964, the date of Wendell Jones' first report which contained the initial disparagement of Gilliland; (2) he assumed Gilliland would have sold to the General Electric plant at Rome, Georgia, all the

welding machines purchased by General Electric at this plant from 1964 to the date of the trial; and (3) he calculated the sales and profits lost by Gilliland at the General Electric plant by using a growth rate based on General Electric's worldwide sale of products.

The District Court instructed the jury that it was:

". . . not bound nor concluded by the opinion testimony of any witness, expert or otherwise, and [the jury] should not consider any expert witness unless [it] found the facts on which that opinion is based are true."

The jury obviously believed to some extent the assumptions of Dr. Dietz since the jury in its answer to the fifth special interrogatory awarded Gilliland $67,000 in damages.

■■■ The credibility of the witnesses in showing damages is for the jury, South-East Coal Company v. Consolidation Coal Company, 6 Cir., 1970, 434 F.2d 767, 794, cert. denied 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149, rehearing denied 404 U.S. 877, 92 S.Ct. 28, 30 L.Ed.2d 124. The fact finders may act on probability and inference, Locklin v. Day-Glo Color Corporation, supra, 429 F.2d at 880.

Hobart complains that it was error for Dr. Dietz to calculate from January 1, 1964, rather than from the later date of Wendell Jones' report, which contained the first sign that Hobart was disparaging Gilliland. Gilliland had introduced into evidence a report made by Wendell Jones on April 25, 1964, where Jones stated that two years previously he had made direct sales efforts against Gilliland's account at the General Electric plant at Rome, Georgia. Jones in this same report also proposed to renew direct sales activity in Atlanta against Gilliland if Gilliland persisted in coming into the Chattanooga area.

■■ From this evidence the jury could reasonably conclude that Hobart's disparagement began before September 23, 1964. "Once the fact [of damages] is established, uncertainty concerning the exact amount of loss [should] not preclude recovery", Fontana Aviation, Inc. v. Beech Aircraft Corporation, supra, 432 F.2d at 1085. The jury's findings as to damages must be affirmed unless the findings are "beyond the pale of sane judgment", Locklin v. Day-Glo Color Corporation, supra, 429 F.2d at 880. Furthermore, once the fact of damage is proven the actual computation of damages may suffer from minor imperfections, South-East Coal Company v. Consolidation Coal Company, supra, 434 F.2d at 794, and cases cited therein.

■ Dr. Dietz's assumptions as to the purchases of wire feeders General Electric would have made is permissible. A fact finder cannot base a judgment as to damages on speculation or guesswork, Zenith Corporation v. Hazeltine, supra, 395 U.S. at 124, 89 S.Ct. 1562. However, the Supreme Court has said as to the certainty of damages in an antitrust suit that:

". . . a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible." Eastman Kodak Company of New York v. Southern Photo Material Company, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927). See, also Flintkote Company v. Lysfjord, supra, 246 F.2d 368, at 391, 392, and cases cited therein.

Sometimes "proof of losses which border on the speculative" must be resorted to "in order to implement the policy of the antitrust laws", Ford Motor Company v. Webster's Auto Sales, Inc., 1 Cir., 1966, 361 F.2d 874, 887.

■■■ Since Hobart spirited away the General Electric account, Hobart cannot complain of the lack of evidence for which it is responsible. See Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc., 5 Cir., 1967, 383 F.2d 97,

106, cert. denied 390 U.S. 904, 88 S.Ct. 816, 19 L.Ed.2d 870. Assumptions as to damages are permissible when future profits must be determined due to the "self-evident intangible nature of the subject matter", Flintkote Company v. Lysfjord, *supra,* 246 F.2d at 391. The types of assumptions made by Dr. Dietz as to future sales has often been allowed, William H. Rankin Company v. Associated Bill Posters of United States, 2 Cir., 1930, 42 F.2d 152, 155, and Locklin v. Day-Glo Color Corporation, *supra,* 429 F.2d at 883.

Hobart fails in its contention that Dr. Dietz used in his calculations to determine damages a projected 8% annual growth rate as applied to the entire General Electric Company instead of using a growth rate applicable just to the General Electric plant at Rome, Georgia. The record clearly shows that Dr. Dietz in his calculations winnowed the growth rate to the General Electric plant at Rome, Georgia.

■ In summary, as to all Hobart's contentions as to errors in the calculations of damages by Dr. Dietz, we do not have as required under Rule 52(a) "the definite and firm conviction that a mistake has been committed", Zenith Corporation v. Hazeltine, *supra,* 395 U.S. at 123, 89 S.Ct. at 1576.

### E. The Charge to the Jury

When the District Judge gave his charge to the jury, Hobart made one exception. Hobart stated that Count Four of Gilliland's counterclaim had set out five instances of disparagement by Hobart. Hobart asked that the jury be limited to those five instances. Hobart contended that the charge allowed the jury to go beyond those five instances. Hobart did not renew this exception on appeal.

Hobart, however, now claims that the District Court's charge to the jury was clearly erroneous, and it is, therefore, reviewable. Hobart claims that the District Court committed three errors which made the charge clearly erroneous. The errors were as follows: (1) the trial judge failed to instruct the jury that it must find a contract, combination, or conspiracy for there to be a violation of § 1 of the Sherman Act; (2) the trial judge failed to remove from the jury's consideration whether Gilliland had been damaged by the loss of the sale to the American Buildings Company, since the District Court had granted Hobart's motion to exclude from evidence any consideration of those damages; and (3) the trial judge failed to remove from the jury's consideration whether Gilliland had been damaged by Hobart's alleged resale price maintenance, since there was no proof of any price fixing by Hobart.

■ If the District Court had failed to mention the necessity for the jury to find a contract, combination, or conspiracy for there to be a violation of § 1 of the Sherman Act, the charge to the jury would have been clearly erroneous. See Prepmore Apparel, Inc. v. Amalgamated Clothing Workers of America, 5 Cir., 1970, 431 F.2d 1004, 1007, cert. granted 401 U.S. 993, 91 S.Ct. 1228, 28 L.Ed.2d 530, cert. dismissed 404 U.S. 801, 92 S. Ct. 21, 30 L.Ed.2d 34. However, the District Court did so instruct the jury. Hobart points to the part of the charge where the District Court said that Gilliland claims that Hobart "by its conduct and acts has unreasonably restrained interstate trade". Hobart claims that the reference to "conduct and acts" was vague and misleading since "it permitted the jury to base its verdict on any one of several patterns of behavior and did not limit the jury's deliberation to the issue whether the restraint arose out of an unlawful agreement". The District Court immediately after the statement Hobart complains of stated that the "pertinent provisions" of the anti-trust laws include the following:

"Every contract, combination or conspiracy in restraint of trade or

commerce among the several states is declared to be illegal."

The District Court went on to say:

"So, any unreasonable interference, by contract or combination or conspiracy, with the ordinary, usual and freely-competitive pricing or distribution system of the open market in interstate trade and commerce, constitutes an unreasonable restraint of interstate trade and is a violation of the federal anti-trust laws."

The District Court made it clear by this further statement that the unreasonable interference must be accompanied by contract, combination, or conspiracy. Therefore, the jury was told that every time unreasonable restraint or interference was mentioned in the charge it referred to such restraints by contract, combination, or conspiracy.

Hobart further complains that the District Court's charge to the jury was erroneous because it referred to "contract or other acts". Hobart argues that this reference to "other acts" authorized the jury to find for Gilliland absent the required contract, combination, or conspiracy. The jury had already been instructed that it must find the necessary contract, combination, or conspiracy. This use of the term "other acts" was, at most, only harmless error, since the charge to the jury must be taken as a whole and not considered in fragments, Garrett v. Campbell, 5 Cir., 1966, 360 F.2d 382, 386, 387, and cases cited therein.

Hobart's two other contentions as to errors in the charge are without merit. The District Court had excluded from evidence damages from the loss of the American Buildings Company account and damages from any resale price maintenance by Hobart. The District Court did not in his charge have to repeat that he had previously made these exclusions, and if Hobart thought such exclusion was material it had the duty to call it to the judge's attention, 53 Am.Jur., Trial, § 603, p. 476.

There was sufficient evidence as to damages Gilliland suffered by its loss of the General Electric account to cover the total award of damages by the jury.

The judgment of the District Court is Affirmed.